DAVID R. ABBOTT & others *vs.* JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY & others.

Suffolk. June 7, 1983. — September 7, 1984.

Present: GREANEY, C.J., ARMSTRONG, & DREBEN, JJ.

*Practice, Civil,* Appeal, Relief from judgment. *Trust,* Pension plan, Breach
of trust, Trustee's authority, Liability of third party for breach of trust.

A judge acting on a motion for relief from judgment after the period for claim-
ing an appeal from the denial of motions for a new trial had expired
had authority to vacate and reenter the order denying the new trial
motions so as to revive appellate rights, where the parties had been
unaware of the denial for over two months because it had not been
entered on the docket. [510-516]

In an action by beneficiaries of an employee pension trust against a trustee
who had participated in transactions whereby the trustees borrowed on
the cash surrender value of annuity contracts and retirement income
policies, which constituted substantially all the assets of the trust, and
then made a loan of the proceeds to a corporation controlled by one of
the trustees, the judge was warranted in finding the trustee liable for
breach of trust despite a clause in the trust agreement exculpating the
trustees from liability for actions taken in good faith. [520-522]

A provision of an employee pension trust stating that the trustees "shall not
be expected to invest, and shall pay no interest on any funds which may
come into their hands under this agreement," considered in the context
of the entire trust instrument, did not authorize the trustees to borrow
out the cash value of annuity contracts and retirement income policies,
which constituted substantially all the assets of the trust, and to use the
proceeds for investment purposes. [522-525]

The trustees of an employee pension trust did not have authority to adopt an
amendment to the trust agreement giving the trustees the power to borrow
on the cash value of annuity contracts and retirement income policies
held in trust and to invest the proceeds, in view of clauses in the trust
agreement providing that no amendment would give the employer any
interest in trust property and requiring an employee's written consent to
any amendment depriving the employee of any vested interest or lessen-
ing such interest. [525-526]

An insurance company which had issued the annuity contracts and retirement
income policies constituting substantially all the assets of a pension trust,

and which possessed a copy of the trust instrument, was bound to take notice of limitations on the trustees' power to borrow on the cash value of the annuity contracts and policies. [526]

A blanket exoneration clause in the instrument establishing a pension trust, purporting to immunize any insurance company from liability for wrongs of the trustees, was without effect to relieve from liability the insurance company which issued certain annuity contracts and retirement income policies held by the trust, where the company had ample indications that the trustees' unauthorized borrowing on the cash surrender value of these contracts and policies was highly improper. [526-527]

Provisions in the annuity contracts and retirement income policies held by the trustees of a pension trust, authorizing the trustees to take out policy loans, could not, in the circumstances, enlarge the powers given the trustees by the trust instrument or relieve the insurance company from liability for participating in the trustees' breach of trust provisions of which it had knowledge. [527]

BILL IN EQUITY filed in the Superior Court on November 7, 1973.

The case was heard by *Goldblatt, J.,* a District Court judge sitting under statutory authority.

*Edward S. Rooney, Jr.,* for John Hancock Mutual Life Insurance Company.

*Robert N. Goldstein* for Leo P. Cavanaugh.

*Bernard A. Dwork (David P. Dwork* with him) for the plaintiffs.

ARMSTRONG, J. The plaintiffs, former employees of Buck Printing Company and potential beneficiaries of the Buck Printing Company Pension Plan and Trust, won a judgment in the Superior Court against Louis P. Mirando and Leo P. Cavanaugh, who were the cotrustees of the pension trust;[1] Mr. Eugene J. Moran, a New York attorney; and the John Hancock Mutual Life Insurance Company (John Hancock), for a diversion of the assets of the trust to International Scanning Devices, Inc., a corporation through which Mirando, in 1972, acquired

---

[1] Both were sued as individuals and as trustees of the pension trust. They were also sued in various other capacities. The judgment refers to, and thus runs against, each only by name, without specifying capacity.

the stock of Buck Printing Company. The case is before us on the appeals of John Hancock and Cavanaugh.[2]

## TIMELINESS OF THE APPEALS

At the threshold lies a procedural problem. The judgment was entered April 14, 1981. On April 24 John Hancock and Cavanaugh filed motions for a new trial under Mass.R.Civ.P. 59, 365 Mass. 827 (1974).[3] The trial judge heard the motions May 6, 1981, and indicated he would take the motions under advisement. Repeated checks of the docket entries during May, June, and July revealed no action on the motions. On July 17 one of the appellants searched through the papers and discovered that each motion bore an inscription that the motion was denied, with the judge's signature and the date May 6, 1981. The denials had not then been docketed, and no notices of denial had been sent to counsel.[4]

On July 23 and 24, 1981, John Hancock and Cavanaugh each filed a motion for relief from judgment under Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974), asking that, in view of the circumstances previously described, the court revise the date of denial on the new trial motions, so as to allow an appeal to be claimed. (Under Mass.R.A.P. 4[a], as appearing in 378 Mass.

---

[2] Buck Printing Company and International Scanning Devices, Inc., were also named as defendants. Both corporations are apparently bankrupt. International Scanning Devices, Inc., was never served with process. Buck Printing Company defaulted, but for reasons unknown the judgment does not run against it. Mirando, who is said now to live in Canada, also defaulted.

[3] No contention is made that service of these motions was not made within ten days of judgment, and the record does not indicate that the motions were not timely. Contrast *Albano* v. *Bonanza Intl. Dev. Co.,* 5 Mass. App. Ct. 692, 693-694 (1977).

[4] An affidavit of counsel for one of the appellants indicates that the clerk's office had, as late as July 1, 1981, informed him that the motions had not been acted on. A letter from the plaintiffs (i.e., the appellees) to the trial judge dated June 26, 1981, urged speedy action on the motions for new trials in order to enable the plaintiffs to pursue certain postjudgment remedies. The trial judge took action on an unrelated motion that accompanied that letter but, so far as the record shows, did not respond to the letter otherwise.

928 [1979], the full time for appeal, in this case thirty days, starts to run from the date of denial of a timely new trial motion.) At some time after July 24 but before August 18, 1981, the denials of the new trial motions were entered on the docket.[5] We cannot identify the date more precisely because the date assigned to them was May 6, 1981, the date that the judge denied the motions.[6]

John Hancock's and Cavanaugh's motions for relief from judgment were forwarded to the trial judge; but he was a District Court judge who had sat on the cases by assignment, and questions apparently arose as to his then authority to act on the motions. Like motions were filed in November, indicating that the trial judge had approved the concept of the motions, and they were allowed on November 19, 1981, by a judge of the Superior Court. The orders specified that date as the date of denial of the new trial motions. The appeals were filed within thirty days thereafter.

---

[5] We have inferred the date-span from the position of the entry on the original docket, a copy of which has been furnished under affidavit by counsel for John Hancock. The denials of the new trial motions are typed in between Cavanaugh's motion under rule 60(b) (July 24) and a plaintiffs' motion entered August 18. Asterisks appear in the margin next to the denials of the new trial motions, and asterisks also appear in the margin after an April 27, 1981, entry and before the next entry, May 22, 1981. We take the asterisks to mean that the denials of the new trial motions should be treated as docketed in the space indicated. The official copies of the docket entries certified to us under Mass.R.A.P. 9(d), as appearing in 378 Mass. 936 (1979), have been reset so as to arrange all entries in order by date. Thus, the docket entries certified to this court under the rule give no clue to the irregularity.

[6] The fact that the motions, with the denial orders subscribed, were found among the papers prior to docketing suggests that the delay was caused by the clerk's failure to notice that the motions had been acted on rather than by the judge's failure to return the motions to the clerk's office after denying them. In the view we take of the case nothing turns on resolution of that question.

We point out, however, that Mass.R.Civ.P. 79(a), 365 Mass. 839 (1974), requires that "[t]he entry of an order or judgment shall show the date the entry is made." The entry is "made" the day the clerk performs the ministerial act of making "a brief but adequate notation of the substance of the [order] in the civil docket . . . . ," 7 Moore's Federal Practice par. 79.02[2] (2d ed. 1984), not the day the order is dated. See *Williams* v. *National Surety Corp.*, 153 F. Supp. 540, 541-542 (S.D.Ala. 1957).

The plaintiffs contend that the judge of the Superior Court was without power to redate (in essence) the denial of the motions for new trial so as to revive appellate rights. The contention is founded on Mass.R.A.P. 4(c), as appearing in 378 Mass. 929 (1979), which expressly limits the authority of the trial court to "extend the time for filing the notice of appeal by any party" to "a period not to exceed thirty days from the expiration of the time otherwise prescribed by this rule." The time so prescribed was thirty days from the order denying the motion for a new trial. Mass.R.A.P. 4(a)(4). As the rule is presently worded, the thirty days run from the date the order is made rather than from the date of its entry. *Feltch* v. *General Rental Co.,* 383 Mass. 603, 612-613 (1981).[7] Thus, the time for filing the notice of appeal as of right expired June 5, 1981, and the period in which the trial judge might have authorized a late appeal under rule 4(c) expired July 6, 1981 (July 5 being a Sunday). The parties, of course, had not learned of the order and would not learn of it for another two weeks.

The *Feltch* case holds that appellate rule 4(c) is to be read in accord with Federal precedents. Federal cases have long held that, as a general rule, a motion for relief from judgment under rule 60(b) may not be used to revive appellate rights after the expiration of the extended time limit specified in appellate rule 4(a). Many of these cases, cited in the margin,[8]

---

[7] Effective January 1, 1985, the second paragraph of appellate rule 4(a) has been amended to provide that, in this situation, "the time for appeal for all parties shall run *from the entry* of the order denying a new trial . . ." (emphasis supplied). See 393 Mass. 1239 (1985). As other appeal periods in civil litigation do not normally commence until an order is entered (see, e.g., first par. of appellate rule 4(a) and G. L. c. 231, § 118, first and second pars.), the new wording eliminates a seemingly pointless incongruity and would doubtless have obviated the problem that arose here.

[8] E.g., *Mizell* v. *Attorney General of New York,* 586 F.2d 942, 944-945 (2d Cir. 1978); *In re Morrow,* 502 F.2d 520, 521-522 (5th Cir. 1974); *Hodgson* v. *United Mine Workers of America,* 473 F.2d 118, 123-125 (D.C. Cir. 1972); *Lathrop* v. *Oklahoma City Housing Authy.,* 438 F.2d 914, 915 (10th Cir.), cert. denied, 404 U.S. 840 (1971). But see *Expeditions Unlimited Aquatic Enterprises* v. *Smithsonian Inst.,* 500 F.2d 808, 809-810 (D.C. Cir. 1974). Other cases applying the general rule but not involving the failure of the clerk to notify the appellant of the entry of the judgment include *West* v. *Keve,* 721 F.2d 91, 95-97 (3d Cir. 1983), *Burnside* v. *East-*

have dealt with neglect to file a timely notice of appeal due to the clerk's failure to notify the parties of the entry of judgment. In this situation the general rule seems plainly mandated by Mass.R.Civ.P. 77(d), 365 Mass. 838 (1974), which, like its Federal counterpart, says that "[l]ack of notice of the entry [of a judgment and other order] by the clerk does not affect the time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, except as permitted in Rule 4 of the . . . Rules of Appellate Procedure."[9] Thus, if this were a simple case of reliance by the parties on the clerk's duty to send notice of orders, neglecting their obligation to check the docket entries periodically, we would in accordance with the clear mandate of the rules and the great weight of Federal precedent conclude that the trial court erred in allowing the defendants' motions for relief from judgment.

There is, however, an exception to the general rule recognized in the Federal cases: namely, where the appellant has in fact consulted the docket entries but has nevertheless failed to learn of the judgment or other order appealed from due to clerical mishap. Thus, in *Rodgers* v. *Watt,* 722 F.2d 456 (9th Cir. 1983), the attorney's secretary checked the docket periodically to determine whether an order had been entered after hearing. The last docket entry was that of the hearing itself, with the notation that the matter had been taken under advisement by the judge. In fact, the judge had entered an order two days after the hearing, but (1) no notice had been sent to coun-

---

*ern Airlines, Inc.,* 519 F.2d 1127, 1128 (5th Cir. 1975), *Wojton* v. *Marks,* 344 F.2d 222, 224-225 (7th Cir. 1965), and *Demers* v. *Brown,* 343 F.2d 427, 427-428 (1st Cir.), cert. denied, 382 U.S. 818 (1965).

[9] Concern by the 1946 Advisory Committee to the Supreme Court for the finality of judgments led to the adoption of this language in 1948. The purpose of the amendment was to overrule the contrary holding of *Hill* v. *Hawes,* 320 U.S. 520 (1944). See 7 Moore's Federal Practice par. 77.01[4] (2d ed. 1984). *Expeditions Unlimited Aquatic Enterprises* v. *Smithsonian Inst.,* cited in note 8, *supra,* seemingly reverts to the reasoning of *Hill* v. *Hawes,* and has been criticized for disregarding the 1948 amendment. See, e.g., the *Mizell* case, also cited in n.8, and *Rodgers* v. *Watt,* cited in the text *infra.*

sel, and (2) the order was docketed out of sequence, prior to the docket entry showing the matter to be under advisement. In *Fidelity & Deposit Co.* v. *USAFORM Hail Pool, Inc.,* 523 F.2d 744 (5th Cir. 1975), the attorney over a six-month period telephoned the clerk periodically to ascertain whether, although notice had not been received, judgment might have entered. "The court, through a member of its staff, informed him that no further inquiry should be made — because the clerk would notify the parties of the judgment when it was entered." 523 F.2d at 748. Shortly afterward the judgment was entered, and the clerk neglected to inform the parties. In both cases the parties did not actually learn of the entry of the judgment or other order until after the period afforded for extensions under appellate rule 4(a) had expired. In *Smith* v. *Jackson Tool & Die, Inc.,* 426 F.2d 5 (5th Cir. 1970), both parties agreed to a delay in the entry of judgment until after the appellant's counsel had returned from an extended trip abroad. They so informed the judge. Before the attorney's return, the judge approved judgment in a form which had been proposed by the opposing attorney. The clerk docketed the judgment but failed to send notice to the parties. After his return, counsel for the appellant, unaware of the entry of judgment, sent the judge objections and suggestions with respect to the form of judgment proposed by the opponent. The opponent, also unaware of the earlier entry of judgment, replied to the objections. The court did not respond to the letters, and the attorneys, as a result, did not learn of the entry of judgment until after the expiration of the additional thirty-day period within which the judge might have authorized a late appeal under Federal appellate rule 4(a). In each of these three cases it was held that the mistakes by the court, going beyond a mere failure by the clerk to notify the attorneys of the entry of judgment (or other order), justified the court's vacating the entry of the judgment or order on a motion under rule 60(b)(1) or (6) and reentering it so as to revive appellate rights. Emphasis was given to the facts that the appellant had acted promptly on discovering the error and that the opponent had not been prejudiced (typically having known that an appeal would be claimed and having shared the misapprehension that

judgment was not yet entered). See generally 6A Moore's Federal Practice par. 60.03[9] (2d ed. 1983); Calkins, The Emerging Due Diligence Standard for Filing Delayed Notice of Appeal in Federal Courts, 19 Willamette L.J. 609, 614 (1983).

Motions under rule 60(b) are typically addressed to the discretion of the judge, *Berube* v. *McKesson Wine & Spirits Co.*, 7 Mass. App. Ct. 426, 435 (1979), and it may seem anomalous, in light of the jurisdictional character of a timely appeal, *Browder* v. *Director, Dept. of Corrections of Ill.*, 434 U.S. 257, 264 (1978), that the trial judge is held to have a discretionary power to extend the deadline indirectly after the time when he is expressly made powerless (by appellate rule 4[c]) to do so directly. The cases so holding may stem in part from the comparative rigidity of the Federal rules on the subject of late appeals. Federal Rule of Appellate Procedure 26(b) forecloses a Circuit Court of Appeals from enlarging the time for filing a notice of appeal, *Griggs* v. *Provident Consumer Discount Co.*, 459 U.S. 56, 61 n.3 (1983), while the corresponding Massachusetts rule, Mass.R.A.P. 14(b), as amended, 378 Mass. 939 (1979), authorizes a single justice of an appellate court to enlarge the time for filing a notice of appeal up to a year after the entry of the judgment or order sought to be reviewed. We do not think that that difference in the Federal and Massachusetts rules requires a more parsimonious interpretation of the trial judge's authority under our rule 60(b)(1) and (6), especially in light of the generally more flexible construction of procedural requirements under Massachusetts practice. See, e.g., *Gilmore* v. *Gilmore*, 369 Mass. 598, 601-603 (1976); *Superintendent of Worcester State Hospital* v. *Hagberg*, 374 Mass. 271, 273-274 (1978). See also Mass.R.A.P. 10(c), as appearing in 378 Mass. 938 (1979). We therefore follow the cases establishing the exception and hold that the order vacating and reentering the May 6 orders denying the motions lay within the discretion of the judge under rule 60(b)(1) or (6). In doing so, we emphasize that the authority to enter such an order exists only in extraordinary circumstances and, in particular, depends on: "(1) absence of Rule 77(d) notice; (2) lack of prejudice to [appellee]; (3) prompt filing of a motion after actual

notice; and (4) due diligence, or reason for lack thereof, by counsel in attempting to be informed of the date of the decision." *Rodgers* v. *Watt,* 722 F.2d at 460.

## MERITS OF THE CASE

The Buck Printing Company Pension Plan and Trust was established in 1944 by an agreement between the company and the trustees (a majority of whom were members of the Reilly family, whose members appear to have owned all outstanding shares of Buck Printing Company). The trust agreement (as amended in 1946) defined the pensions for which employees would be eligible at retirement, the determining factors being the employee's longevity with Buck and his average compensation for the entire period. The trustees were to purchase insurance company annuity contracts or retirement income policies making provision for monthly retirement income in the amount called for by the trust agreement, commencing at normal retirement age (sixty-five[10]), and guaranteed for life (or for ten years if longer, the employee designating a beneficiary). As employees became eligible for larger pensions additional annuity contracts or policies were to be purchased. The company annually was to pay to the trustees, ten days before expiration of the grace period, the aggregate of the premiums due on the outstanding contracts, less any amount the trustees might have available for that purpose,[11] and the trustees were to pay the premiums.

Employees' interests in the pension plan vested in stages as provided in the plan,[12] and, while the company reserved to itself

---

[10] An employee who was fifty-six or over when he became a member of the plan had a later normal retirement, based on attaining the earlier of ten years of service or age seventy. The plan also made provision for early retirement, at an actuarially reduced rate, based on hardship, disability, or illness.

[11] Under the plan the trustees might receive funds from other sources, the principal source being the cash surrender value of the unvested portion of contracts (see note 12, *infra*), terminated by reason of an employee's leaving the service of Buck for reasons other than hardship, disability, or illness.

[12] An employee who terminated his service with the company for a reason other than death, hardship, illness, or disability would, if he had been an

the right to amend or terminate the plan, contracts and policies taken out would accrue solely to the benefit of the employees. During the continuation of the plan, the annuity contracts or retirement income policies were to be held, physically, by the trustees, who were designated as the legal owners, and the employees were specifically prohibited from assigning or encumbering their interests in the annuity contracts or policies.[13] Under no circumstances was Buck to receive any benefit from the trust, directly or indirectly.[14]

By 1972 Buck was operating at a substantial loss, and the Reilly family decided to sell the company to the defendant Louis Mirando. The vehicle for the transaction was a corporation, located in Canada, called International Scanning Devices, Inc. (ISD), of which Mirando was president and principal stockholder. The Reillys sold all the issued and outstanding stock of Buck to ISD, receiving in return $100,000 in cash, 30,000 shares of ISD, and promissory notes totalling $800,000 of which $600,000 was secured by substantially all the physical assets of Buck. Mirando caused himself, Mr. Moran (the attorney for ISD), and one Sullivan to be elected directors of Buck and selected the defendant Cavanaugh, whose background was

---

employee for five years or more, retain twenty-five percent of the value of his annuity contracts or policies on a paid-up basis; if he had been an employee for ten years or more, fifty percent; if fifteen years or more, seventy-five percent; and if twenty years or more, he would retain the entire value of the contracts, which would be put on a paid-up basis. In each of these instances the employee would not "have any right to secure the cash surrender, commuted, or loan value of any [such] contract" (art. VI § 2), but he could elect to receive retirement benefits before the normal retirement age at an actuarially reduced rate.

[13] Article VI, § 3, of the trust provided that "[e]xcept with respect to contracts which [an employee] has received free of trust, no [employee] or no beneficiary shall have any right to assign, pledge, encumber or otherwise transfer any of the benefits, payments or proceeds of any contract, and no interest in any such contract and no such contract shall be reached or applied by any creditor of the [employee] or any beneficiary."

[14] Article XVIII of the trust, entitled "No Reversion to Employer," provided: "Under no circumstances and in no event shall any funds which at any time have been contributed to this Trust or any funds or property at any time held by the Trustees (except as provided in Article XVI) inure to the benefit of the Employer either directly or indirectly."

formerly as a salesman for printing companies, to be president and treasurer. Buck, which, under the terms of the trust, retained the power to remove and appoint trustees of the pension plan, notified John Hancock of the resignation of the prior trustees and the designation of Mirando and Cavanaugh in their stead.

In December, 1972, approximately two months after taking over control of Buck, Mirando asked Mr. Moran to ascertain whether the trustees could borrow on the cash surrender value of the annuity contracts and policies. Mr. Moran sought the advice of an insurance consultant in New York, who wrote back that "the concensus [sic] of opinion" of two persons whom he asked was that they could.[15] Apparently to quell any remaining doubt, Mirando and Cavanaugh executed an amendment to the trust agreement, providing that "nothing . . . in this agreement shall be construed to . . . prevent the [t]rustees from borrowing against the contracts issued hereunder from the insurance company issuing such contract, provided that [Buck] will . . . post with the [trustees] collateral sufficient to guarantee repayment of the amount being borrowed from the [t]rust, and, further, that [Buck] shall pay a reasonable rate of interest. . . ."

Mirando and Cavanaugh then approached John Hancock, which lent (without, so far as the record shows, any inquiry) to the trustees, on the security of the policies, the entire loan value ($152,513.16) of all of the outstanding contracts, including several for employees who had already terminated their employment with Buck and whose policies had been put on a paid-up basis (see note 12, *supra*). John Hancock retained $7,339.02 of this sum to pay overdue premiums on the policies.

---

[15] One of the two, a bank vice-president, indicated that since the Buck pension trust document did not specifically say the trustees could not borrow, they probably could. The other, a certified life underwriter with an insurance company (not John Hancock), who gave no indication of having seen the trust document, wrote that "[i]n general, IRS frowns on a closely held corporation [borrowing] funds from a qualified Pension Trust" unless the loan is for "a reasonable rate of return" and is backed by "security of a reliable nature."

The John Hancock agent with whom the trustees dealt (who later testified that he had never before heard of trustees of a pension trust borrowing on the cash surrender value of policies) was told that the money was to be used to obtain new machinery for Buck. In fact, Mirando, Cavanaugh, and Moran (who was also present) knew that the money was to be lent to ISD. The entire balance ($145,174.14) was so lent, at a rate (seven percent) which could be (and was) found not to represent a reasonable rate of return. The promised security (shares of ISD owned by Mirando) was never delivered. In a remarkable testament to the inattention of the trustees, the note they received in return for the loan stated that *they* promised to pay the borrowed sum to ISD, rather than the reverse; and when, at a later time, Cavanaugh had engaged counsel to protect his interests and the latter counsel discovered the error, the original note was replaced with one which called for interest to be paid only from the date of correction.

In any event, none of the money, interest or principal, was ever paid to the trustees, nor, of course, was any used to purchase machinery for Buck. Buck became bankrupt in 1974, and the stock of ISD became worthless. No premiums were paid after the date of the loan, and in March, 1975, Mirando (by then living in Canada and the sole remaining trustee) was notified by John Hancock that all of the policies had lapsed for nonpayment of premiums.

After a lengthy trial the judge found that Mirando and Cavanaugh, acting as trustees of the pension trust, and Mr. Moran, acting as its attorney, all violated their fiduciary duties to the employees "by jointly causing an improper loan to be made of the assets of the trust for the purposes of benefiting the employer and its stockholder in contravention of the terms of the [t]rust . . ." The judge found John Hancock liable on several theories, one of which was that the trust did not authorize the trustees to borrow on the policies and that John Hancock, which had a copy of the trust document and was aware of its provisions, thus participated in a breach of trust by the trustees. He ordered the entry of a judgment, the form of which is not objected to, imposing liability on each of those

four defendants. As mentioned at the outset, the case comes before us on the appeals of Cavanaugh and John Hancock only.

## LIABILITY OF CAVANAUGH

Cavanaugh argues that the borrowing by the trustees against the loan value of the policies was permitted by the terms of the trust, that it was based on the advice of counsel (i.e., Mr. Moran) as to its propriety, and that his (Cavanaugh's) participation in the loan over to ISD was not found to be the product of bad faith on his part. Cavanaugh emphasizes that he had no experience in matters of this type and in effect claims to have been gulled by Mirando, who (the evidence suggests) was the ultimate beneficiary of the pension fund assets. Cavanaugh seems to concede that he could be held personally liable if simple negligence were the standard of liability. Article XIII, § 3, of the trust agreement, however, imposes a more lenient standard of liability for trustees: "No trustee shall be liable for anything which he does or fails to do so long as he uses good faith. . . . The trustees shall be under no liability for any action taken by them in reliance upon the advice of counsel."

It is not necessary for us to consider whether Cavanaugh might prevail on the "advice of counsel" defense despite the conflicts of interests, known to Cavanaugh, which tended to taint Moran's advice.[16] That advice concerned the authority of the trustees to borrow on the security of the policies (concededly, an issue on which well intentioned lawyers might reach different answers). The more damning evidence against Cavanaugh concerns the loan over to ISD. No one attempts to argue (nor, reasonably, could they) that this loan over was a proper transaction. ISD was inherently a risky investment. On uncontradicted evidence which would have justified a stronger finding, the judge found that it "was in the developmental stage and was not commercially producing a product in any

---

[16] Most particularly, the fact that he was counsel for ISD, not for the Buck pension plan trustees.

substantial volume." The loan was at "a very favorable rate" (seven percent). Buck itself was contemporaneously borrowing from commercial sources at twelve percent. Apart from the quality of the loan as an investment decision, the note the trustees received to evidence the transaction was fundamentally defective, and Cavanaugh turned over the funds without receiving the promised security. And that security, even if received, would have been as risky as the borrower itself.

It is difficult to imagine a finder of fact determining on these findings that a trustee of reasonable intelligence, like Cavanaugh, could in good faith have arrived at a conclusion that the ISD loan transaction was in the best interests of the pension plan members. The judge did not in terms state that Cavanaugh had acted in bad faith; but that is the substance of his express findings. Specifically, he found that the loan was not entered into for the purpose of benefiting the trust. Rather, he found that Cavanaugh (and Moran) both felt that their actions were dictated by Mirando and that "Cavanaugh understood that his job as [p]resident and [treasurer] of Buck Printing Company depended upon the desires and continued good will of Mirando." If Cavanaugh sanctioned the loan transaction to protect his job, heedless of the best interests of the beneficiaries of the pension trust, he put himself beyond the protection of any exoneration clause which can be given legal effect. See *New England Trust Co.* v. *Paine,* 317 Mass. 542, 550-551 (1945); *Dill* v. *Boston Safe Deposit & Trust Co.,* 343 Mass. 97, 100 (1961). Restatement (Second) of Trusts § 222(2) (1959).

The judge also found, to be sure, that Cavanaugh and Moran both felt that the loan would inure to the benefit of Buck Printing Company by enabling it, in some vague way, to do additional business with ISD. That feeling does not contradict the implied finding of bad faith. In his role as trustee Cavanaugh was bound to use good faith in protecting the interests of the employees as they were members of the pension plan. Taking the judge's findings in the light most favorable to Cavanaugh, at the critical juncture.he used his assumed powers as trustee to further the interests of the company. To do so he jeopardized (indeed, substantially annulled) vested pension rights. At the

time the loan was made to ISD, six of the seven plaintiffs had already been discharged or otherwise left the employ of Buck. Buck's interests and those of the prospective pensioners clearly diverged.

Cavanaugh argues that the judge's findings should not be taken at face value because he adopted them verbatim from those proposed by the plaintiffs. Such a practice is discouraged, *Cormier* v. *Carty,* 381 Mass. 234, 236-237 (1980), but it does not void the findings nor automatically displace the "clearly erroneous" standard of review. *Id.,* at 237-238. *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 417 (1980). Because the findings crucial to the liability of Cavanaugh largely reflect the view of the facts expressed by the judge at trial,[17] we conclude with fair assurance that the adopted findings correctly reflect the judge's independent judgment. *Id.* at 418. No purpose would be served by a remand for further findings.

## Liability of John Hancock

The trial judge predicated the liability of John Hancock on the proposition that the latter participated in a breach of the trust by the trustees knowing or having reason to know that their actions constituted a breach of its terms. As to liability in these circumstances, see *Tingley* v. *Norton Middlesex Sav. Bank,* 266 Mass. 337, 340 (1929); *Proctor* v. *Norris,* 285 Mass. 161, 165 (1934); *Jones* v. *Swift,* 300 Mass. 177, 185 (1938); *Banks* v. *Everett Natl. Bank,* 305 Mass. 178, 182 (1940); Scott, Law of Trusts § 326 (1967). It is not disputed that

---

[17] At trial the judge expressed the view that Cavanaugh had permitted himself to be used as Mirando's puppet and asked Cavanaugh at one point whether he had considered at the time that he might be charged criminally as an accessory to embezzlement. These and other remarks led both defendants to suggest that the judgment should be reversed because the trial judge showed sympathy towards the plaintiffs. There is no suggestion, however, that his sympathy was grounded in bias or prejudice, rather than in a natural reaction to the evidence as it unfolded. As the trial was jury-waived, there was no prejudice to the defendants in the judge's being less than circumspect in disclosing his reactions.

John Hancock knew the trust's terms. We turn to the question whether the first loan, that from John Hancock to the trustees, was a breach of the trust without regard to the propriety of the loan over to ISD.

The Buck Printing Company Pension Plan and Trust was not a pension trust in the usual sense of that phrase: that is to say, the trustees of the plan did not hold liquid assets (e.g., regular contributions based on a percentage of wages) in trust for investment purposes. Instead, the amounts they received were geared strictly to the amounts they needed to pay the premiums on the annuity contracts or retirement income policies called for by the pension plan as they came due. The pension plan did not contemplate that the trustees would hold cash for investment purposes.

There was a provision of the trust which both sides seek to use for their advantage. It appears in art. XIII, § 5, describing the powers and duties of the trustees and states: "The Trustees shall not be expected to invest, and shall pay no interest on any funds which may come into their hands under this agreement." We agree with the defendants that this provision, by itself, cannot be read as barring investment by the trustees. On the other hand, in the context of the entire agreement, it seems clear to us that the provision is addressed to the fact that, under the agreement, small sums of money might come into the hands of the trustees incidentally. The employer, for example, is obligated to pay the premium money to the trustees ten days before the expiration of the grace period, making it theoretically possible for the trustees, if so inclined, to earn perhaps a week's interest on the money. Again, upon early termination by an employee, the cash surrender value of the unvested portion of his annuity contracts (see notes 11 and 12, *supra*) would be returned to the trustees, to be held by them and applied to reduce the amount the employer would otherwise be required to give the trustees for payments of the next annual premium. It was with reference to such incidental sums that the trust agreement relieved the trustees of any obligation to invest.

It would subvert the essential scheme of the pension plan to read the provision in question more broadly, as vesting in the

trustees, by negative implication, an authority to borrow out the cash value of all the contracts and policies entrusted to their care and to use the proceeds for investment purposes. The plan plainly contemplates, as is suitable for a small company like Buck, that the function of investment will be left to professionals (here, insurance companies) and that the central function of the trustees is to purchase and hold annuity contracts and retirement income policies. The provisions of the plan spell out in much detail the manner in which the latter is to be done; if the trustees were to go beyond this role and, by borrowing, create an investment fund, the trust leaves them with nothing by way of guidance or instruction. Most tellingly, the trust provides no vehicle by which any profit realized by the trustees (i.e., the difference between the investment income they could earn on the borrowed funds and the interest they must pay the insurance company) could inure to the benefit of the employees covered by the pension plan. Rather, any such profit, like other sums held by the trustees, must be applied to the premium payments, so as to reduce the employer's contribution. The employees would thus derive no benefit from the taking of the additional risk, and there would seem to be direct conflict with the provision (note 14, *supra*) that "[u]nder no circumstances and in no event shall any funds which at any time have been contributed to this [t]rust . . . inure to the benefit of the [e]mployer, either directly or indirectly." A reduction in the employer's obligation to make premium payments is a benefit to the employer, even if indirect.

The fact that the trust agreement did not contain a provision expressly prohibiting policy loans does not necessarily mean that they were permitted. It could as well be argued, from the fact that no provision expressly authorized general borrowing by the trustees, that they lacked such a power. There was a provision which expressly authorized one particular type of borrowing by the trustees: namely, they were directed to make provision for automatic premium payments out of policy values. (The provision explained that it was not intended to relieve the employer of the obligation to pay the trustees the sums needed for premium payments but was intended only to

avoid inadvertent lapse.) The fact that the draftsman authorized limited borrowing for a particular purpose might be some indication that he did not envisage unlimited borrowing; but we prefer to place our decision on the sense of the instrument read as a whole, *State Street Trust Co.* v. *Crocker,* 306 Mass. 257, 260 (1940), which, as we have said, seems entirely inconsistent with the existence of the power.

What we have said to this point concerns the provisions of the trust prior to the amendment of March 19, 1973. That amendment, it will be recalled, was adopted immediately before the trustees approached John Hancock and stated that nothing in the trust agreement was to be construed to prevent the trustees from borrowing generally against the policies held in the trust. The power of the employer to amend the trust agreement, however, was not unlimited: there were two specific limitations (in art. XVII), consistent with the general object of the trust to qualify for tax-exempt status by guaranteeing the employees against recapture of trust assets by the employer: (1) "[N]o such amendment shall give the [E]mployer any interest in any contract or any property held in trust hereunder"; and (2) "no such amendment shall, without the written consent of [the employee,] deprive him of or lessen any right or interest to which he is already entitled by reason of premiums already paid." The trust was explicit that the legal incidents of ownership were to remain in the trustees prior to the time of retirement (or earlier termination) when the policies would be put on a paid-up basis and transferred to the employees outright. Until that time, "[n]o member shall have any right, title or interest in any contract except the right to receive annuity payments or to have death benefits payable as provided in this trust . . . ." The equitable right to receive the pensions stated in the plan was a right which could not be destroyed or lessened by any amendment adopted without the employees' consent. A policy loan, unless repaid, will have the inevitable effect of lessening (or, in these cases, substantially destroying) the pensions called for by the plan. The contingent right is not as valuable as the absolute right. An amendment which gave the trustees the power to recapture the substance of the employees'

vested pension rights was, in our view, one which, under the terms of the trust agreement, could not be given legal effect without the consent of the employees. No such consent was sought or given.

We thus conclude that the trust agreement gave the trustees no authority to borrow on the annuity contracts and retirement policies held by them in trust and that their doing so constituted in itself a breach of the trust. John Hancock knew the terms of the trust agreement, of which it had a copy at all times relevant to this decision. Dealing with trustees, John Hancock was bound to take notice of the limitations on their powers. As one "with notice that trust funds [were] being wrongfully diverted" and who "join[ed] in assisting [the trustees] to misappropriate such funds, [John Hancock] is bound to account to the trust estate for the loss thereby sustained." *Banks* v. *Everett Natl. Bank,* 305 Mass. at 182.

Public policy forbids giving full effect to a clause purporting to immunize John Hancock from participation in the wrongs of the trustees, no matter how egregious.[18] If it can be effective to relieve John Hancock of liability for participation in acts of the trustees honestly thought by it to be appropriate, nevertheless there were ample indications here to alert John Hancock that the actions of the trustees were highly inappropriate. Officers of that company acknowledged the unprecedented nature of the request by the Buck trustees. The John Hancock officials knew that the authority of the trustees to borrow on the policies was sufficiently questionable in their own minds to cause them to attempt to amend the trust to create the power. At the same time they were aware of the limitations on the authority of Buck

---

[18] The exoneration clause appearing in art. XIV of the trust instrument states: "No Insurance Company shall be required to take cognizance of any of the provisions of this instrument or to question the authority of the Trustees to do any act with respect to any contracts taken out hereunder. The responsibility of the Insurance Company is limited to the terms of any contracts which it may issue. Any Insurance Company may conclusively assume that the Trustees have full power and authority to take any action taken or proposed to be taken with respect to any contract and in particular to receive and receipt for any money coming due and payable to said Trustees under any contract."

to adopt such an amendment. They were told that the loan was to be made to Buck, but, as that company was already substantially in arrears on its premium payments, they had reason to suspect that Buck was not a suitable investment vehicle for the pension trust. Thus forewarned, an inquiry by Hancock through ordinary commercial channels presumably would have substantiated Buck's lack of credit worthiness. John Hancock was also aware that some of the policies being borrowed on had already been put on a paid-up basis, indicating that the beneficiaries were no longer in Buck's employ. John Hancock joined with the Buck trustees after the loans had been made in refusing to give information about the loan transactions to the terminated employees. We think that, as the holder of the substantial assets which constituted the financial underpinning of the pension plan, and as the only person in a position to know of a substantial and serious breach of trust by the pension plan trustees, John Hancock is precluded by public policy considerations from relying on a blanket exoneration clause.

Nor do we think that John Hancock can rely on the fact that the annuity contracts and retirement income policies contained provisions authorizing the holder (here, the trustees) to take out policy loans. It is manifest that no contract entered into by the trustees with John Hancock could enlarge the authority given to the trustees by the trust instrument. If that were not self-evident on general principles, it is made explicit by art. VI of the trust itself: "The trustees shall not exercise any rights which they have as owners of any contract except in conformity with and for the purpose of carrying out the terms of this trust." It is equally clear that John Hancock, knowing of the trust provision, cannot avoid liability to the beneficiaries by entering into a contract obligating itself to participate in a breach of trust.[19]

---

[19] John Hancock argues that it was required by G. L. c. 175, §§ 132(7) and 142, to include a provision for policy loans in the Buck contracts. Some of those contracts were simple "annuity contracts," and a policy loan provision is not required by § 132 to be included in such contracts. The so-called "retirement income policies" were primarily annuity contracts, but they contained an insurance component: namely, a death benefit to a designated

## THE OTHER CLAIMS

John Hancock filed a counterclaim against the plaintiff DuWors (a former trustee of the pension trust) and a cross-claim against the defendant Cavanaugh. These claims were filed in response to an amendment to the plaintiffs' complaint which sought to predicate John Hancock's liability on its alleged failure to take notice of, and to attempt to secure the correction of, certain improper acts and omissions of the trustees. Liability predicated solely on those failures, it is argued, would have made John Hancock, in essence, liable as a joint trustee based solely on the wrongdoing of others. In the view we take of the case, however, the liability of John Hancock is based on its own knowing participation in a wrongful breach of trust. In these circumstances the counterclaim and the cross-claim, if we correctly understand their intent, serve no purpose. The judge did not err in dismissing either.

The judgment, the form of which has not been objected to, is affirmed.

*So ordered.*

---

beneficiary if the employee should die before reaching normal retirement age. (The benefit was one hundred times the monthly benefit on retirement.) For the distinction between insurance and annuity contracts, see *Helvering* v. *LeGierse,* 312 U.S. 531, 540-541 (1941); *Zimmermann* v. *Commissioner of Internal Revenue,* 241 F.2d 338, 340-341 (8th Cir. 1957). The retirement income policies were a hybrid and may be subject to the statute in some form. (It would presumably be possible to segregate the portion of the cash value attributable to the death benefit from the portion attributable to the annuity component.) We need not decide the point, as we know of no statute or authority that would have precluded John Hancock from protecting itself by separate contractual provision against a demand by the trustees that would constitute a breach of the underlying trust.