COMMONWEALTH *vs.* NORMAN HAWKESWORTH
(and a companion case[1]).

Suffolk.  May 2, 1989. — September 12, 1989.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Delinquent Child. Jurisdiction,* Delinquent child, Transfer
    hearing. *Practice, Criminal,* Transfer hearing, Findings by judge, Sever-
    ance. *Evidence,* Privileged communication, Cumulative, Statement of
    codefendant. *Constitutional Law,* Confrontation of witnesses. *Felony-
    Murder Rule.*

Two defendants were not entitled to dismissal of the murder indictments
    against them on the ground that a judge in a District Court juvenile
    session, who presided at the hearing on the defendants' transfer to the
    Superior Court for trial as adults, had adopted verbatim the findings and
    rulings proposed by the Commonwealth, where these findings were well
    supported by the record and reflected the judge's own determinations
    as indicated by his active participation in the hearing. [668-672]
The admission of certain testimony at a criminal trial, even if error, was
    nonprejudicial where the challenged testimony was cumulative of evi-
    dence properly admitted. [672-673]
At the joint murder trial of two individuals charged in the shooting of a
    motorist, the admission in evidence of an unredacted written statement
    made by one of them after arrest, which substantially recounted the
    crime but described his codefendant as the gunman, was error requiring
    reversal of the codefendant's conviction, notwithstanding the judge's
    limiting instructions to the jury. [673-675]

INDICTMENTS found and returned in the Superior Court De-
partment on November 15, 1985, and December 5, 1985,
respectively.

The cases were tried before *Sandra L. Hamlin,* J.

*Kimberly Homan (Norman S. Zalkind* with her) for Norman
Hawkesworth.

*Stephen Hrones* for John Morgan.

[1] Commonwealth *vs.* John Morgan.

*David B. Mark,* Assistant District Attorney (*James Hamrock,* Assistant District Attorney, *& Julie W. Heflin,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

LIACOS, C.J. Convicted of murder in the first degree, on a felony-murder theory, the defendants appeal, claiming various errors in their transfers from the juvenile session of the District Court to the Superior Court and in their joint trial. Each defendant challenges the verbatim adoption, by the District Court judge, of the Commonwealth's proposed findings and rulings in his transfer decision, and each challenges the sufficiency of the evidence in support of those findings. The defendant John Morgan also asserts that certain testimony at his transfer hearing was improperly admitted. As to the trial, the defendant Morgan claims error in the admission of an inculpatory statement of the defendant Norman Hawkesworth, where Hawkesworth was not subject to cross-examination.[2] Finally, both defendants attack the application of the felony-murder rule to them, and they request that we reduce the verdicts against them pursuant to our extraordinary power under G. L. c. 278, § 33E (1988 ed.). We reject the defendants' claims of error in their transfers to Superior Court, and we affirm the verdict against the defendant Hawkesworth; however, we reverse the conviction of the defendant Morgan under the principles enunciated in *Bruton* v. *United States,* 391 U.S. 123 (1968), and our parallel cases. We therefore remand for a new trial as to Morgan. We summarize the evidence before the jury, which consisted largely of the testimony of the other participants in the crime alleged.[3]

---

[2] Morgan also claims error in the prosecutor's closing argument and in the judge's charge to the jury. However, we do not address Morgan's arguments because we decide on the grounds stated to remand for a new trial as to Morgan, and because the errors, if any, are not likely to recur at retrial. In addition, we have considered whether the trial judge's charge caused a substantial likelihood of a miscarriage of justice as to the defendant Hawkesworth, and we conclude that it did not.

[3] Jody Mendez pleaded guilty to murder as a juvenile, after the Commonwealth sought unsuccessfully to have him tried as an adult. He testified against the defendants in exchange for a grant of immunity from prosecution for other pending offenses. Kristen St. Onge testified in exchange for the Commonwealth's not attempting to try her as an adult, and she pleaded guilty to murder as a juvenile. Regina Hawkesworth did not testify.

1. *The event.* The jury would have been warranted in finding the following facts on the evidence presented. On the night of June 19, 1985, the defendant Norman Hawkesworth met with three other juveniles, his sister Regina Hawkesworth, Kristen St. Onge, and Jody Mendez. They met at Hawkesworth's home in a housing complex in the Hyde Park section of Boston. After some discussion, Mendez suggested that the group should steal an automobile. Mendez proposed the following ruse: one of the boys would lie in the roadway pretending to be injured, the two girls would flag down a passing motorist, and then the group would overpower the motorist and take the automobile. The group agreed to this plan. Shortly thereafter, John Morgan arrived, and agreed to participate. Hawkesworth produced a can of mace and distributed additional weapons: a handgun to Mendez, knives to the girls, and a billy club to Morgan. Morgan responded, "Good, I get to smash somebody's — head."

All five participants then walked to an unlighted section of West Boundary Road in the West Roxbury section of Boston. Along the way, Mendez fired the gun into the ground. Hawkesworth, visibly upset, exclaimed, "Damn, I only got one bullet left."

Upon finding a suitable site, the participants assumed their positions. Mendez lay in the roadway with the pistol concealed; the girls stood over him and attempted to flag down a motorist; and Hawkesworth and Morgan hid in the woods on either side of the roadway. One or two motorists stopped and asked whether everything was all right; but, because the automobiles each had several passengers, Mendez stood up and said that he was fine. Hawkesworth then exchanged places and weapons with Mendez.

The victim, Stephen Lanigan, was driving alone when he saw Hawkesworth and the girls in the roadway. He stopped at the roadside, left his automobile, approached Hawkesworth and the girls, and asked if everything was all right. Hawkesworth jumped up, pointed the gun at Lanigan, and said, "Freeze, — or I'll shoot." Lanigan then turned and ran toward his automobile; Hawkesworth pursued. As Lanigan was entering

his automobile, Hawkesworth shot him in the back, from less than a yard away.

Lanigan drove his automobile a short distance and crashed into a signal box. Shortly thereafter, after being taken to Faulkner Hospital in Jamaica Plain, Lanigan was pronounced dead. Hawkesworth, meanwhile, had told everyone to run. He, Mendez, and the girls ran into the woods together. Morgan ran along West Boundary Road.

Officer Edward Shaughnessy of the Boston police department responded to a radio dispatch and examined the site of Stephen Lanigan's crashed automobile. Shaughnessy then drove along West Boundary Road, passing Morgan who was sitting by the side of the roadway. Shaughnessy reached the housing complex, reversed direction, and observed Morgan a second time, walking by the roadside. Shaughnessy stopped his cruiser in front of Morgan and asked if he could have a word; Morgan agreed. The two were joined by Detective Peter Doherty of the Boston police department; Shaughnessy then left.

Morgan stated that his name was John Milane, that he lived in Cambridge (although he had left his home there), and that he was on his way to visit his friend, Norman Hawkesworth. Morgan denied having seen anything or heard any gunshots on the road. Doherty drove Morgan to Norman Hawkesworth's house, verified with Hawkesworth's mother that the two were friends, and left.

Morgan, Hawkesworth, and the other three participants regathered sometime after midnight at a campsite where Morgan and Hawkesworth had fired the gun on prior occasions. Morgan then asked Hawkesworth if he had wiped the fingerprints off the gun. Hawkesworth said that he had, and that he had thrown the gun into some bushes.

A week later, on June 27, 1985, a hiker came upon the campsite and discovered a gun, wrapped in a windbreaker, wedged between some rocks. The gun was later identified as the weapon used to shoot Lanigan; the windbreaker belonged to Morgan. On June 28, 1985, Detective James Solari of the Boston police department obtained a warrant to search Hawkes-

worth's house. He discovered Hawkesworth's diary in a bed-
room closet. The diary contained the following entry for June
20, 1985, the day after the shooting: "Last night was a trip,
boom, bang. That's all that needs to be said. Damn, I couldn't
believe it. The young Norman finally came out. I don't want
to get into describing my late night activities, but all that needs
to be said is in riddles for people's safety, especially mine."

2. *The District Court judge's verbatim adoption of proposed
findings and rulings in his transfer decisions.* The history of
the transfer hearings in this case is unfortunate. The Common-
wealth sought to transfer from the juvenile session of the Dis-
trict Court to the Superior Court three of the five juveniles
involved in the incident — Mendez, Hawkesworth, and Mor-
gan. After a finding of probable cause, which is not challenged,
the District Court judge held a brief transfer hearing on October
2, 1985. He declined to transfer Mendez, but on October 17,
1985, he did transfer the defendants Hawkesworth and Morgan.
The defendants then moved in the Superior Court to dismiss
the indictments on the ground that the written findings of the
District Court judge were too few and too conclusory under
G. L. c. 119, § 61, and our case law. On April 17, 1986, a
Superior Court judge denied the motions to dismiss, but re-
manded the cases to the District Court judge for new hearings
and for more comprehensive findings. After the defendants'
separate hearings, on July 23 and August 13, 1986, the Com-
monwealth submitted a set of proposed findings and rulings
as to each defendant. The Commonwealth later stipulated that,
when the District Court judge signed these proposed findings
and rulings on August 27 and September 16, 1986, he made
no changes. The defendants again moved to dismiss, but their
motions were denied on February 2, 1987, by a second Superior
Court judge. We review that decision.[4]

---

[4] The defendants sought relief, before trial, from a single justice of this
court. The single justice noted that the Commonwealth did not ask for
remand, which would have been problematic in any event, and was "willing
to take its chances." Therefore, the single justice declined to rule on the
validity of the transfer process in advance of trial.

General Laws c. 119, § 61 (1988 ed.), requires that before a juvenile may be transferred to Superior Court for trial as an adult, a District Court judge must enter "a written finding based upon clear and convincing evidence that the child presents a significant danger to the public as demonstrated by the nature of the offense charged and the child's past record of delinquent behavior, if any, and is not amenable to rehabilitation as a juvenile." Section 61 also requires that, after a finding of probable cause, the judge "shall then consider, but shall not be limited to, evidence of the following factors: (a) the seriousness of the alleged offense; (b) the child's family, school and social history, including his court and juvenile delinquency record, if any; (c) adequate protection of the public, (d) the nature of any past treatment efforts for the child, and (e) the likelihood of rehabilitation of the child."

The findings of fact signed by the District Court judge carefully and thoroughly address each of these statutory factors under separate headings. The defendants contend, however, that their indictments must be dismissed because the judge adopted the Commonwealth's proposed findings.[5] We disagree.

The defendants are correct to criticize the judge for failing to heed our repeated cautions not to adopt proposed findings verbatim. See, e.g., *Lewis* v. *Emerson*, 391 Mass. 517, 524 (1984). In so doing, the judge undermines the utility of fact finding, which is to "(1) insure the quality of a judge's decision making process by requiring simultaneous articulation of the judge's underlying reasoning; (2) assure the parties that their claims have been fully and fairly considered; and (3) inform

---

[5] The defendant Hawkesworth also attacks the District Court judge's adoption of the proposed findings on Federal due process grounds. However, the cases cited by Hawkesworth require, at most, that the findings be sufficient to "demonstrate . . . the careful consideration of the Juvenile Court [and] . . . permit meaningful review." *Kent* v. *United States*, 383 U.S. 541, 561 (1966). This is no more than our own cases require. Furthermore, the United States Supreme Court has taken the same approach as we have to the verbatim adoption of proposed findings. The Court carefully scrutinizes the record, but does not change the standard of review. *United States* v. *Marine Bancorporation*, 418 U.S. 602, 615 n.13 (1974), citing *United States* v. *El Paso Natural Gas Co.*, 376 U.S. 651, 656-657 (1964).

an appellate court of the basis on which a decision has been reached." *Cormier* v. *Carty*, 381 Mass. 234, 236 (1980). However, the defendants cite no case in this Commonwealth or elsewhere in which a judge's adoption of proposed findings, by itself, resulted in dismissal. To the contrary, the adoption of proposed findings, even verbatim, "does not void the findings nor automatically displace the 'clearly erroneous' standard of review." *Abbott* v. *John Hancock Mut. Life Ins. Co.*, 18 Mass. App. Ct. 508, 522 (1984), citing *Cormier* v. *Carty*, *supra* at 237-238; *Markell* v. *Sidney B. Pfeifer Found.*, 9 Mass. App. Ct. 412, 417 (1980). See *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 622 n.12 (1985). Rather, "findings which fail to evidence a 'badge of personal analysis' by the trial judge must be subjected to stricter scrutiny by an appellate court." *Cormier* v. *Carty*, *supra* at 237 (citations omitted).

The defendant Morgan argues that some unspecified, more stringent rule should apply in criminal cases. Morgan cites no authority for this proposition, and we think it unwise, at least in this context. First, the standard for appellate review of facts in both civil and criminal cases is identical, and we see no reason to create a special rule in this case. Compare Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974) (trial judge's findings of fact shall not be set aside unless clearly erroneous), with *Commonwealth* v. *Cadoret*, 388 Mass. 148, 150 (1983) (trial judge's findings of fact must stand unless clearly erroneous). Second, we do not wish to deprive ourselves of the judge's credibility judgments, on which his transfer decisions necessarily relied, simply because the judge was careless in failing to rework proposed findings. See *Cormier* v. *Carty*, *supra* at 237 n.7 (noting difficulty of assessing credibility on "cold" record). Provided the findings accurately reflect what evidence the judge chose to believe, and provided that belief is not clearly erroneous, we should not void them. "Whether a finding of fact is clearly erroneous is not a function of diction or style." *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 314 (1988). Therefore, we turn to the record to discern whether the judge carefully considered the statutory factors and whether the findings which he adopted accurately reflect his determinations of fact.

We have reviewed carefully the transcripts of the defendants' transfer hearings and the evidence in the record that was presented to the District Court judge. These sources reveal that the judge participated actively in the hearing and was familiar with the written evidence submitted in advance of the hearing. He asked questions of the witnesses, he guided the proceedings so as to adhere to the statutory factors, and he explained to counsel the basis for several of his rulings. Such participation indicates that the judge did consider the statutory factors carefully. *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.,* *supra* at 314-315. Furthermore, the judge's participation suggests that the Commonwealth's proposed findings, which carefully avoided hyperbole and tendentiousness, were likely to reflect the expressed sentiments of the judge. See *Abbott* v. *John Hancock Mut. Life Ins. Co.,* 18 Mass. App. Ct. 508, 522 & n.17 (1984) (proposed findings reflected judge's view expressed at trial). Accord *Markell* v. *Sidney B. Pfeifer Found.,* 9 Mass. App. Ct. 412, 431 (1980) (judge may seek assistance of counsel for party in whose favor crucial issues of veracity have been decided to organize findings consistent with judge's pivotal decision as to credibility). We also note that the judge signed the proposed findings within five weeks of the hearings, so that his memory of the facts was not likely diminished. *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp., supra* at 314-315.

In addition, there is strong evidence that the judge exercised his discretion carefully. He refused to transfer Mendez; and the evidence in favor of transferring the defendants was strong. It is clear that the judge did not base his transfer decisions solely on one factor, such as the potential duration of treatment before age eighteen (or twenty-one), or "the nature of the offense." See, e.g., *A Juvenile* v. *Commonwealth,* 370 Mass. 272, 282 (1976) (error to transfer solely because of seriousness of charge and inadequacy of existing juvenile facilities in terms of safeguarding the public). Accord *Commonwealth* v. *Costello,* 392 Mass. 393, 397 (1984) (judge did not err in according significant weight to one factor where remaining factors also were weighed). Finally, there is abundant clear and convincing

evidence that each defendant presented "a significant danger to the public" and was not "amenable to rehabilitation as a juvenile." G. L. c. 119, § 61. We need not recite the copious findings in support of these conclusions. The judge was not bound by the views of the defendants' experts on the issue of rehabilitation. *Commonwealth* v. *Watson*, 388 Mass. 536, 539 (1983). We are satisfied that the findings reflect the judge's own determinations, and that they are well supported. *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank, supra.*

3. *Morgan's transfer: testimony claimed to be privileged.* The defendant Morgan claims that some of the testimony by two witnesses at his transfer hearing violated his right to prevent disclosure of certain communications to social workers under G. L. c. 112, § 135 (1988 ed.), and assertedly under G. L. c. 66A (1988 ed.) (Fair Information Practices Act). The first witness, Lindo Ferrini, was executive director of an agency (Hilltop) which had accepted the defendant Morgan in residence when Morgan was eleven years of age. Ferrini testified about Morgan's history at Hilltop. Also, over objection, Ferrini was directed to read aloud two reports from Hilltop's records.[6] The other witness, Barbara Curley, was a supervisor with the Department of Social Services who testified about Morgan's history of treatment by that agency.

Assuming without deciding that the testimony was privileged, there was no prejudicial error in admitting it. The testimony was essentially cumulative, not only of the Commonwealth's properly admitted evidence but also of evidence introduced by the defendant Morgan himself. See *Commonwealth* v. *Zezima*, 365 Mass. 238, 242 (1974) (potentially privileged testimony not prejudicial, in part because it was cumulative). In fact, the judge noted the cumulative nature of Curley's

---

[6] The Hilltop reports apparently were prepared by clinical psychologists. However, Morgan did not claim that his communications were privileged on the ground that they were made to a psychotherapist relative to his mental or emotional diagnosis or treatment. G. L. c. 233, § 20B (1988 ed.). We therefore have considered this additional ground for excluding the testimony only to determine whether there was a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Richmond*, 379 Mass. 557, 562-563 & n.4 (1980).

testimony during the hearing. Furthermore, the reports read by Ferrini suggested that Morgan was amenable to rehabilitation. One report concluded "[Morgan] is in need of a therapeutic milieu which is both highly structured and consistently nurturing." The other report concluded that Morgan "seems to be an excellent candidate for psychotherapy and is intellectually capable of academic placement in a regular school setting which is recommended." Thus, in the context of other evidence of Morgan's troubled childhood, the testimony was at worst ambiguous and at best favorable to Morgan. Finally, in eighteen pages of comprehensive findings as to Morgan, there is no discernable reliance on the testimony at issue. Thus, Morgan was not prejudiced by the admission of arguably privileged testimony at his transfer hearing.

4. *The Bruton issue (Morgan).* During the defendants' joint trial, the Commonwealth introduced a statement written by the defendant Hawkesworth after his arrest, substantially recounting the events leading to Lanigan's death, but describing the defendant Morgan as the gunman.[7] Hawkesworth had attempted

---

[7] The handwritten statement is not entirely legible, but the defendant Morgan offers the following transcription, which is not challenged.

"I'm only writing this to prove to myself I aint a killer. Nobody else is to read this only us . . . . This is the true story of how the incident happened. Were all over my house, Jody, John, Kristin, J— and myself were watching tv. Jody says to Norm, Norm let's go out and do a gig. I says come on, John says were you'll going. Jody tells him and know John coming to. Were at the front door in there —, just outside. She call Jina[?] and Jina says let's go with them. 5. Know the 5 of us are walking down West Boundary Rd when John says wait a minute. So we sit down. John goes over to a rock, picks it up and pulls out the gun[?] which is in a brown paper bag. Jody goes over to him, takes the guns and shoots 1 bullet in the ground. John said don't waste the bullets. I have only 2 left. So know he has 1 bullet left. So he[?] sits back down. Jody's[?] —— & Kristin — ——. John[?] just sat there bored. The John got up and said I know how we can do it. We didn't pay him no mind[?] at first. Then John started saying we could — in the middle of the street and wait for a car to pass. So we tried that. Norm sat down on the ground first, that[?] didn't seem to work. So Jody sat down and cars just kept passing by without stopping. Only 1 car stopped and said are you alright and the girls replied — I'll get help and he drove off. So we said fuck it. Then were already to go back to the house. Then John says, Norman, you and Kristin set in the bushes and Jina and Jody in the other bushes. So we do it. John says he's going to rob

to have Mendez sign the statement. The Commonwealth introduced this statement solely, it claimed, as evidence of Hawkesworth's consciousness of guilt. The judge instructed the jury that the statement could not be used against Morgan. The defendant Morgan, in anticipation of this evidence, moved repeatedly for separate trials, and he objected to the statement's introduction at trial, in whole or in part, on the basis of *Bruton* v. *United States*, 391 U.S. 123 (1968). The judge admitted the entire statement. This was error requiring reversal.

We have stated that: "According to *Bruton*, severance is constitutionally required where: a co-defendant's extrajudicial statements are offered in evidence at a joint trial; the statements are 'clearly inadmissible' as against the defendant; the co-defendant is not subject to cross-examination because he does not testify; and, finally, there is a substantial possibility that, in determining the defendant's guilt, the jury relied on the co-defendant's 'powerfully incriminating extrajudicial statements' notwithstanding any limiting instructions from the judge." *Commonwealth* v. *Pontes*, 402 Mass. 311, 314 (1988), citing *Bruton* v. *United States*, *supra* at 128 & n.3, 135-136. The Commonwealth asserts that *Bruton* does not govern this case because, allegedly, the full weight of the Commonwealth's case was contrary to Hawkesworth's statement, or because, alternatively, the statement was harmless beyond a reasonable doubt. These arguments are not persuasive. It matters not that the Commonwealth argued Hawkesworth's statement should

---

someone walking by. So we wait for about 20-25 minutes. Nothing happens. But while John's laying there in the middle of the street he doesn't notice that a car has stopped right in front of him. The man gets out, heads over to John. Jody flashed his light at Norm. That means let's kick [or kill -?] on him. So the 4 of us head down the path. We set about 50 yards and then we here a gun shot. We look at each other as if to say, what do we do? So we start walking away and here comes John runni[n]g down the street. He yells kick, kick. So we run over to the campsite and are waiting for John. We are wondering what did he do.

"This is the true way it happened.

"Finish later.

There are 4 signature lines, all are blank.

This written statement was available to the jurors during their deliberations.

be disbelieved. The jury remained free to believe Hawkesworth's statement, in whole or in part. *Commonwealth* v. *Cinelli*, 389 Mass. 197, 204, cert. denied, 464 U.S. 860 (1983). Thus, this case falls within the ambit of *Bruton*.

The Commonwealth's argument that the admission of the unredacted statement was harmless is also flawed. The Commonwealth relies on the fact that a portion of the statement was cumulative of other evidence against Morgan, and that the judge gave limiting instructions. Supposing that the cumulative portion of the statement was harmless, this argument ignores the substantial portion of the statement that was not cumulative — including that part which painted Morgan as the killer. The Commonwealth's reliance on limiting instructions ignores the fact that the Supreme Court in *Bruton* rejected such reliance, because "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant that the practical and human limitations of the jury system cannot be ignored." *Bruton* v. *United States*, *supra* at 135. Therefore, the admission of Hawkesworth's unredacted statement was not harmless beyond a reasonable doubt, and the defendant Morgan must have a new trial.

5. *Other issues*. The defendants' arguments that the felony-murder rule is unconstitutional under the Federal and State Constitutions already have been considered and rejected. *Commonwealth* v. *White*, 392 Mass. 282, 287-288 (1984). *Commonwealth* v. *Moran*, 387 Mass. 644, 647-650 (1982). *Commonwealth* v. *Watkins*, 375 Mass. 472, 485-488 (1978). We have no occasion to narrow the application of the felony-murder rule beyond the limits already set in *Commonwealth* v. *Matchett*, 386 Mass. 492, 501-508 (1982).

We see no basis in the record to reduce the verdict against the defendant Hawkesworth pursuant to our extraordinary power under G. L. c. 278, § 33E. Therefore, as to the defendant Hawkesworth, the judgment is affirmed. As to the defendant Morgan, because of the *Bruton* error discussed above, we reverse the judgment, set aside the verdict, and remand to the Superior Court for a new trial.

*So ordered.*