CREDIT DATA OF CENTRAL MASSACHUSETTS, INC., &
another[1] *vs.* TRW, INC.

No. 93-P-160.

Middlesex. May 18, 1994. - October 7, 1994.

Present: SMITH, KAPLAN, & LAURENCE, JJ.

*Contract*, Performance and breach, Construction of contract. *Trade Secret. Consumer Protection Act*, Businessman's claim. *Practice, Civil*, Findings by judge. *Estoppel*.

At the trial of a civil action, the judge should have found for the plaintiff where the defendant's liability and breach of contract were established; the matter was remanded for a determination of damages on that claim alone. [446-448]

CIVIL ACTION commenced in the Superior Court Department on October 4, 1989.

The case was heard by *Thomas E. Connolly*, J.

*James J. Marcellino* for the plaintiffs.

*Roy A. Bourgeois* for the defendant.

KAPLAN, J. The plaintiffs, Credit Data of Central Massachusetts, Inc. (CDCM), and Credit Data of Rhode Island, Inc. (CDRI), sued the defendant, TRW, Inc. (TRW), alleging breach of contract and related wrongs. The action was bifurcated and was tried, nonjury, on the issue of liability alone. The judge found for the defendant. We reverse and remit the case for trial on the issue of damages.

The plaintiffs were local credit reporting agencies which collected credit information about consumers and sold the information to any who requested it. They were affiliated with the defendant TRW, a national credit reporting agency. Like

[1]Credit Data of Rhode Island, Inc. (Formerly there were additional parties plaintiff and defendant, but they have dropped out of the litigation.)

other national organizations, TRW attempts to offer comprehensive national credit information to inquirers and obtains it through its affiliation by contract with local agencies in all parts of the country and through its own direct efforts of acquisition.

When in 1988 TRW was consummating a merger with Chilton Corporation, a competing national credit organization, the United States Justice Department raised questions about the merged company's capacity to stifle competition in stated areas. Accordingly, TRW entered a consent decree agreeing to sever its ties with certain affiliates. CDCM and CDRI were among the affiliates to be terminated.

The termination was governed by the following language in their contracts with TRW (the text is from the CDCM agreement which parallels that in the CDRI agreement):

> "*Right to the Data Base*
>
> "(a) *Ownership*: CDCM's Data Base shall be the property of CDCM subject to the rights of TRW set forth in this Agreement. CDCM may, at its request, upon any termination of this Agreement . . . secure possession of CDCM's Data Base as then stored with TRW, either printed out in credit report form or in a computer-readable form as may be mutually agreed by the parties . . . . Following such transfer of CDCM's Data Base to CDCM, TRW shall have no further right, title, claim or interest in or to any of the information obtained in CDCM's Data Base, and TRW shall not make any further direct or indirect use of such information. However, nothing shall prevent TRW from obtaining such information directly from the public record or third parties, including CDCM subscribers."[2]

---

[2]While the text speaks of CDCM's database being the property of CDCM "subject to the rights of TRW set forth in this Agreement," we are not referred to any pertinent language of the Agreement besides that in the present quotation and that which follows.

Earlier in the agreement, CDCM's "database" is defined as follows:

> "*CDCM's Data Base*: All credit information and records stored in the TRW System, no matter how or by whom collected, having a current address within CDCM's Zip Code Area."

When the plaintiffs received notice of termination, they decided to go out of business: they exercised their right to secure possession of their databases by asking TRW to transfer them to the Credit Bureau, Inc. of Georgia (CBI), another national credit reporting organization. The plaintiffs had agreed to sell their databases to CBI, the sale price to be a multiple — 250% — of the revenues (as defined) generated by the databases in CBI's hands over the course of a year. The plaintiffs also requested that TRW temporarily maintain the capacity to recall the databases so that, if there were any problems in the transfer to CBI, a back-up copy would be available.

On August 16, 1989, Richard Downing, Sr., president of CDCM, wrote to Robert Petrowski of TRW: "Notwithstanding your keeping a record of the information on site until we notify you to delete it,[3] all of the records and information should, per our contracts with you, be removed from access in the TRW system as of the shutdown Saturday night 8/19/89 and all subscriber numbers for these records and information are to be invalidated at the same time. We would appreciate a confirmatory memorandum for our files from you to that effect." Responding for Petrowski, Phillip Hagedorn of TRW wrote the next day: "The shutdown will be Sunday Night 8/20/89 and as of that date your Framingham [i.e., CDCM] and Rhode Island [CDRI] information will no longer be available to TRW users."

It is agreed that TRW followed its contractual obligation to give possession of the plaintiffs' databases to the plaintiffs

---

[3]This introductory language referred to the temporary retention of databases until the transfer to CBI was accomplished satisfactorily.

(i.e., their designee, CBI). TRW transferred a computer tape containing the plaintiffs' databases to CBI, as instructed, and no problems were reported.

But regarding TRW's other post-termination obligation, namely, to delete and make no further use of the plaintiff's databases, directly or indirectly,[4] it is clear that TRW was noncompliant: it did not delete the databases from its system; rather, large portions of these databases remained in the system, and TRW continued to use them.

It is needless for purposes of the present appeal to go into the full technological detail of what TRW did. It will suffice to say, in more general terms: First, TRW retained in its system and used the portions of the plaintiffs' databases containing information that TRW claims it could secure with ease from other sources. The claimed availability of this material to TRW followed from the fact that various companies ("grantors" or "subscribers") that rendered credit information about consumers to the plaintiffs also rendered the like information to other credit agencies as well ("joint preamble" cases), and TRW claimed it had ready access to those agencies or some of them through affiliation or other relationship.[5] Second, TRW deleted the portions of the plaintiffs' databases with information not thus obtainable by TRW from other sources.

The portions of the plaintiffs' databases that TRW did not delete but rather retained in its system were certainly substantial, although one's perception of the matter may be colored by the unit of measurement applied. TRW would say that the information from 850 of the approximately 1,017 subscribers to the plaintiffs' agencies was deleted. By contrast, the plaintiffs would say that many subscribers counted among the 850 contributed little information, so that, in

---

[4] Although the contract speaks in terms of TRW's no longer making use of the plaintiffs' credit information, the parties equate this requirement with the deletion of the information from TRW's computer system.

[5] Some other subscribers signed "releases" to TRW or an affiliate purporting to give permission to TRW to retain their information on TRW's system, but this could not absolve TRW from its contractual obligation to the plaintiffs to delete the databases in their entirety.

bulk, perhaps only 10% of the total information on the plaintiffs' databases was deleted.

On October 4, 1989, the plaintiffs commenced the present action in Middlesex Superior Court against TRW alleging breach of contract as the principal count.[6] The action was tried, nonjury, on the issue of liability. The judge held for TRW, filing findings of fact, rulings of law, and order for judgment that tracked almost word for word the findings, etc., prepared by TRW. We reverse, holding that liability and breach have been sufficiently shown, with damages remaining to be tried.

As already noted, the quoted language of the controlling agreement is plain enough in requiring that the plaintiffs' databases be wholly deleted. There has been some effort by TRW, reflected, unsurprisingly, in the judge's findings, to argue that the agreement really meant that only the information exclusively owned by the plaintiffs should be deleted, and the "joint preamble" materials were not so owned. "Ownership" as applied to credit information in the present context is a slippery conception to begin with; in any event, the agreement was not written in such terms, as is obvious from the very definition of what constituted the plaintiffs' databases, quoted above. And compare note 5 above.

TRW attempts to justify its failure to delete so much of the databases on the ground that it would be senseless for TRW to delete when it could replace or restore the information from other databases and then use it. It is not established by actual practice just how readily or effectively or completely TRW could accomplish the replacement, and one can surmise that there must have been an advantage to TRW in retaining those portions of the plaintiffs' databases rather than relying on a process of replacement. But quite apart from such considerations, the agreement required the deletion of the whole of the plaintiffs' databases and forbade

---

[6]Initially the plaintiffs brought suit in Federal court, but this was abandoned when it appeared that subject matter jurisdiction was lacking. TRW (and other then defendants) sought to remove the present action to Federal court, but this failed.

TRW to retain and use any part of them — provisions emphasized by the specific permission accorded TRW, if it wanted information from any of the plaintiffs' past subscribers, to go to them and collect from them.

TRW makes a labored argument under the title of estoppel —that it was at the plaintiffs' instance that it kept information from the plaintiffs' databases on line. This refers to the safeguard requested by the plaintiffs to deal with a possibility that the transfer to CBI might misfire. The transfer was achieved successfully, and full deletion was then required. There was no room for anything resembling an estoppel against the plaintiffs' asserting their contractual rights.

Lastly, TRW says the damages accruing in any event to the plaintiffs would be insignificant. Therefore, TRW contends, any breach must be held "not material" and hence not actionable. Further, TRW says a suit bound to result in no more than nominal damages should be dismissed, at least according to California law.[7] The answer to all this is that the present action was purposely bifurcated, and only liability has been tried. It would be foolhardy and quite wrong to make any attempt to forecast on the present record what damages could be shown to follow from the breach. By way of example, we do not know the bearing of the breach on the business done by CBI which would be reflected in revenues earned by CBI and thus in the calculation of payments due by CBI to the plaintiffs; we do not know the value of the benefit that TRW may have conferred on itself by its retention and use of the undeleted information. (We add, incidentally, that the "materiality" of a breach affects the counter-contracting party's right to refuse its own performance; it does not itself affect the latter's right to maintain an action for damages. See *Superior Motels, Inc.* v. *Rinn Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1051 [1987]; Restatement [Second] of Contracts § 346[1] & comment a [1981].)

*Other counts.* Added to the count for breach of contract were counts that sounded in conversion of trade secrets,

---

[7]The agreement with TRW provided that it be construed according to California law.

breach of the covenant of good faith and fair dealing, and violation of G. L. c. 93A. Trade secrets were not shown to be involved; any claim as to good faith, etc., was engrossed by the claim of breach of contract; and we think there was not enough "rascality" (as distinguished from poor advice or judgment) on the part of TRW, see *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979), to base a recovery under c. 93A, § 11.[8]

We treat with some details in the margin.[9]

*Regarding the judge's findings.* We believe a California court would say with us that the agreement calls unambiguously, as matter of law, for the deletion of the plaintiffs' databases without an exception for "joint preamble" cases. It is not apparent whether the judge's findings dispute this as a textual reading; to the extent that they may do so they are erroneous in point of law and deserve no deference. *Simon* v.

---

[8]Also note the question whether alleged misdeeds "occurred primarily and substantially" in Massachusetts, a requirement for recovery under § 11. See *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 308-309 & n.4 (1988).

[9](1) Copying from a comment by TRW, the judge wrote confusingly that "[t]he plaintiffs' database simply did not exist as defined in the contract." All this can mean is that the information from the plaintiffs' databases, when taken into TRW's system, was not organized geographically. But it is not claimed that this disabled TRW from deleting the information as called for by the agreement, and in fact TRW did delete part of it.

(2) To make up for the fact that on TRW's system credit information is not organized by individual consumer, TRW uses an "ident" device — a kind of index — by which it can locate all the information pertaining to any individual. TRW argued that the agreement did not require it to delete the idents because they are not credit information and so not part of the plaintiffs' databases. Idents were created automatically when particular information went into the TRW system and, it seems, would disappear when this information was deleted — like the withdrawal of an entry in an index when the referenced material is withdrawn. Thus the problem resolves itself as the basic question of the extent of the required deletion of information is resolved. At all events idents are a detail.

(3) TRW contends that it was not required to delete "consumer dispute statements." These are statements that individuals are entitled by law to have entered in relation to items in their credit history when they dispute the items. TRW has deleted the consumer dispute statement when it has deleted the particular item. So again the problem is connected to the basic problem and is no more than a detail.

*Weymouth Agric. & Industrial Soc.*, 389 Mass. 146, 148-149 (1983); *PJNR, Inc.* v. *Department of Real Estate*, 230 Cal. App. 3d 1176, 1179 (1991). The findings for the most part try to suggest extraneous excuses for TRW's disregard of the contract terms: "senselessness," lack of actual damages. These purported excuses either are negated by the contract terms themselves or attempt erroneously to anticipate the hearing on damages. As to estoppel, the facts needed for such a defense are absent, so it may be said that the judge's findings (express or implicit) are clearly erroneous. See *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. 119, 123 (1992); *Highland* v. *San Bernardino*, 4 Cal. App. 4th 1174, 1193 (1992).[10] (We need not add the usual strictures against wholesale adoption of a party's proposed findings, see *Lewis* v. *Emerson*, 391 Mass. 517, 524 [1984], or mention the lesser weight or deference attaching to those findings on appellate review. See *Commonwealth* v. *Hawkesworth*, 405 Mass. 664, 670 [1989], citing *Cormier* v. *Carty*, 381 Mass. 234, 237 [1980].)

The judgment is reversed, and the action is remanded for trial on the issue of damages.

*So ordered.*

---

[10]As to the weight to be given findings on appellate review, it may be that Massachusetts standards should apply. Cf. *American Country Ins. Co.* v. *Bernhard Woodwork, Ltd.*, 412 Mass. 734, 739 (1992).