WEST PARK ASSOCIATES, a California limited partnership; Gateway Loop Land Limited, I, an Oregon limited partnership; Roseburg Mini–Warehouse, Ltd., an Oregon limited partnership; Atwood Arms, Ltd., a partnership; et al., Plaintiffs–Appellants,

v.

BUTTERFIELD SAVINGS & LOAN ASSOCIATION, a California savings and loan association; Butterfield Development Corporation, a California corporation; Butterfield Venture Corporation, a California corporation; Butterfield Capital Corporation, a California corporation, et al.; Schwabe, Williamson, Wyatt, Moore and Roberts; Pike, Urand and Morello, Defendants–Appellees.

WEST PARK ASSOCIATES, a California limited partnership; Gateway Loop Land Limited, I, an Oregon limited partnership; Roseburg Mini–Warehouse, Ltd., an Oregon limited partnership; Atwood Arms, Ltd., a partnership; et al., Plaintiffs–Appellants,

v.

BUTTERFIELD SAVINGS & LOAN ASSOCIATION, a California savings and loan association; Butterfield Development Corporation, a California corporation; Butterfield Venture Corporation, a California corporation; Butterfield Capital Corporation, a California corporation, et al.; Schwabe, Williamson, Wyatt, Moore and Roberts; Pike, Urand and Morello, Defendants–Appellees.

Nos. 93–35004, 93–35194.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1994.

Decided July 28, 1995.

Frederick T. Smith, J. Bradford Shiley, John P. Crowell, Carla Anderson, Portland, OR, for plaintiffs-appellants.

Arden E. Shenker, Michael J. Gentry, Tooze, Shenker, Duden, Creamer, Frank & Hutchison, Portland, OR, for defendant-appellee Pike, Urland & Morello.

Thomas W. Brown, Cosgrave, Vergeer & Kester, Portland, OR, for defendant-appellee Schwabe, Williamson, Wyatt, Moore & Roberts.

Peter J. Deidrich, Pettit & Martin, Los Angeles, CA, and Ann S. DuRoss, F.D.I.C., Washington, DC, for defendants-appellees F.D.I.C.

Before: TANG * and WIGGINS, Circuit Judges, and HENDERSON,** District Judge.

WIGGINS, Circuit Judge:

## OVERVIEW

Plaintiffs–Appellants ("Appellants") are thirty-two property owners who sold property in Oregon and Washington to Butterfield Savings & Loan ("Old BSL") in exchange for preferred stock in the bank holding company that was the sole owner of Old BSL. Shortly thereafter, Old BSL was declared insolvent and was placed into a receivership by federal banking regulators. As a result, the bank holding company was left without any assets and Appellants' stock therein was rendered essentially worthless. We are asked to consider whether and against whom Appellants

---

* Judge Tang concurred in the opinion before his death on July 18, 1995.

** Hon. Thelton C. Henderson, United States District Judge for the Northern District of California, sitting by designation.

may seek to recover. The district court granted summary judgment for Defendants–Appellees ("Appellees"). We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

## FACTS

In early 1984, the ratio of Old BSL's equity to its deposits had fallen below the requirements imposed by the Federal Home Loan Bank Board ("FHLBB"). To forestall regulatory action, the sole owner of Old BSL, Butterfield Equities Corporation ("BEC"), had to enhance Old BSL's equity. BEC and Old BSL decided to issue preferred stock in BEC in order to purchase real estate that would be used to increase BSL's equity cushion. The real estate was purchased from Appellants by Old BSL and/or its subsidiaries ("the Butterfield Subsidiaries").[1]

The last of the stock-for-property transactions with Appellants closed on September 30, 1984. The following day, Old BSL and the FHLBB entered into a "no-growth order" prohibiting any further expansion by Old BSL. The real estate transactions failed to shore up Old BSL's balance sheet, however, and on August 7, 1985, the FHLBB declared Old BSL insolvent and appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") receiver for Old BSL. That action stripped BEC of its only asset and rendered Appellants' stock in BEC essentially worthless. The Federal Deposit Insurance Corporation ("FDIC") later succeeded the FSLIC as receiver.[2]

Rather than liquidate Old BSL, the FHLBB directed the FDIC, as receiver for Old BSL ("FDIC–Receiver"), to enter into a Purchase and Assumption ("P & A") Agreement with Butterfield Federal Savings and Loan ("New BSL"). Accordingly, immediately after it seized the assets of Old BSL, FDIC–Receiver entered into an Acquisition Agreement with New BSL whereby most of the assets and liabilities of Old BSL were acquired by New BSL. Expressly exempted from that transfer were certain of Old BSL's liabilities to "shareholders." In conjunction with execution of the Acquisition Agreement, FDIC–Receiver entered into a "Receiver Agreement" with the FDIC in its corporate capacity ("FDIC–Corporate"), whereby FDIC–Corporate acquired the remaining assets and most of the remaining liabilities of Old BSL. Left with FDIC–Receiver, however, were Old BSL's liabilities to its "stockholders."

Appellants filed suit in Oregon state court against New BSL, the Butterfield Subsidiaries, and the two law firms that participated in BEC's preferred stock offering (Pike, Urland & Morello, and Schwabe, Williamson, Wyatt, Moore & Roberts). Appellants did not name BEC as a defendant. The FDIC, as receiver for Old BSL, intervened as a party defendant and removed the case to federal court (FDIC–Receiver, New BSL, and the Butterfield Subsidiaries are referred to collectively as the "Butterfield Defendants"). In their sixth amended complaint, Appellants alleged three state-law claims for relief: (1) violation of Oregon Blue Sky Law for the offer to sell unregistered securities; (2) violation of Oregon Blue Sky Law for the sale of unregistered securities; and (3) sale of securities by untrue statements or omissions.

Only the district court's rulings that are the subject of this appeal will be described. By order dated September 3, 1991, the district court dismissed the claims for sale of unregistered securities (count two) of ten plaintiffs who sold property in Washington ("the Washington Plaintiffs"). By order dated November 26, 1991, the district court granted summary judgment against Appellants on all their claims against two of the Butterfield Defendants, New BSL and the Butterfield Subsidiaries, because the court determined that FDIC–Receiver was the only Butterfield Defendant potentially liable on Appellants' claims. On November 25, 1992 (as amended on January 26, 1993), the district court granted summary judgment in favor of all the remaining defendants on all

---

1. Butterfield Development Corporation, Butterfield Property Management Corporation, Butterfield Capital Corporation, and Butterfield Venture Corporation.

2. Although some of the actions described herein were taken by FSLIC before the FDIC succeeded it as receiver, for ease of reference, this opinion refers to both entities as the "FDIC."

three of Appellants' claims. The court based that ruling on its conclusion that BEC, who was not a defendant, was the sole "seller" of the stock; accordingly, none of the defendants could be liable for violating Oregon's Blue Sky Law relating to the *sale* of securities, as alleged in the complaint. Having granted summary judgment in favor of all Appellees on all counts, the court did not rule on Magistrate Judge Dale's finding that defendant Schwabe, Williamson, Wyatt, Moore & Roberts ("Schwabe") could not be liable as a "control person" under Oregon law.

Judgment was entered on November 25, 1992. Appellants timely appeal, raising four arguments: (1) the district court erred in determining that BEC was the sole "seller" of the stock and in granting total summary judgment for Appellees on that basis; (2) the magistrate judge erroneously concluded that defendant Schwabe could not be liable as a "controlling person"; (3) the district court erroneously dismissed the Washington Plaintiffs' claims in count two; and (4) the district court erred by granting summary judgment in favor of New BSL and the Butterfield Subsidiaries.

## DISCUSSION

### I. STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). We must determine, viewing the evidence in the light most favorable to Appellants (the non-moving party), whether there are any genuine issues of material fact and whether the lower court correctly applied the relevant substantive law. *See id.*

We also review *de novo* the lower court's interpretation of a statute, *Home Sav. Bank v. Gillam*, 952 F.2d 1152, 1156 (9th Cir.1991) (federal banking statute); *Palmer v. United States*, 945 F.2d 1134, 1135 (9th Cir.1991) (state statute), and the court's dismissal on statute of limitations grounds of count two as to the Washington Plaintiffs, *see Washington v. Garrett*, 10 F.3d 1421, 1428 (9th Cir.1993).

### II. STOCK–FOR–PROPERTY TRANSACTIONS

Appellants' second cause of action in their sixth amended complaint alleges that the stock-for-property transactions violate Oregon's Blue Sky Law because they involve the sale of unregistered securities. *See* Or.Rev. Stat. § 59.055 (1988) ("It is unlawful for any person to offer or sell any security in this state, unless: (1) The security is registered and the offer or sale is not in violation of ... any condition, limitation or restriction imposed by the director upon such registration...."); Or.Rev.Stat. § 59.115 (1988) ("A person who sells a security is liable ... if the person: (a) Sells a security in violation of Oregon Securities Law or of any condition, limitation or restriction imposed upon a registration...").

Appellants do not assert a violation by BEC, the entity that registered and issued the securities. Instead, Appellants allege that the Butterfield Defendants were "sellers" of the stock, and that BEC's registration does not apply to them, thus rendering the stock they sold "unregistered." The lower court concluded that BEC was the sole "seller" of the stock and on that basis granted summary judgment for Appellees. The lower court never reached the question of proper registration.

#### A. Determination of "Seller"

If BEC had issued the stock to Appellants in return for a promise to reduce the price for which the properties were to be sold to the Butterfield Defendants, then BEC would be the sole "seller" of the stock and Appellees would prevail in this case. On the other hand, if, as Appellants argue, BEC had issued the stock to the Butterfield Defendants, who in turn had conveyed it to Appellants in partial satisfaction of the purchase price obligation, then Appellants would prevail. Neither of these characterizations accurately describes the actual stock-for-property transactions, however, and we decline to adopt either one.[3] Instead, we turn to the Oregon statute.

---

3. We do not know why BEC and the Butterfield

Defendants chose to structure the transactions in

The statutory definition of the term at issue at the relevant time provided:

> "Sale" or "sell" includes every disposition or attempt to dispose of, contract to sell, attempt or offer to sell, exchange of, option for the sale of, solicitation of an offer to purchase, or subscription for, a security or an interest in a security for a consideration, directly or by an agent, circular, letter, advertisement or otherwise, regardless of whether or not any person so acting has power to pass title to or control the disposition of the security or acts as a finder. Any security given or delivered with, or as a bonus on account of, a purchase of securities or any other thing shall constitute a part of the subject of such purchase and shall have been offered and sold for a consideration. A gift of assessable stock by or for any issuer or promoter shall constitute a sale. The offer, sale, transfer or issue for a consideration of any right, privilege, option or warrant which gives the holder or another person a present or future right to subscribe for or purchase another security of the same or another issuer shall be an offer of such other security.

Or.Rev.Stat. § 59.015(11)(a) (1975) (amended and renumbered at Or.Rev.Stat. § 59.015(15)(a) (Supp.1994)).

■ BEC, as the issuer of the stock, clearly was a "seller" within the meaning of Oregon's securities laws. *See Metal Tech Corp. v. Metal Teckniques Co.*, 74 Or.App. 297, 703 P.2d 237, 244 (1985) ("[a]s an issuer, Metal Teckniques should be considered to have sold its shares"). However, we do not read former section 59.015(11)(a) to preclude the possibility that other entities besides the issuer may also be "sellers." The statute expressly states that a "seller" need not be one who holds title to the securities prior to the transaction.[4] The statute thus suggests that a "sale" of securities may be effected by more than one entity. "[E]very disposition ... of [or] contract to sell ... a security ... for a consideration, directly or by an agent, ... regardless of whether or not any person so acting has power to pass title to or control the disposition of the security" constitutes a "sale." Or.Rev.Stat. § 59.015(11)(a) (1975).

■ Rather than focusing on who has title to the securities, former section 59.015(11)(a) focuses on who transfers the securities and who receives the consideration for the transfer. In this case, the Butterfield Defendants received the direct benefit of the stock—the partial satisfaction of a contractual purchase price—while BEC benefitted indirectly by retention of the cash in BSL's subsidiaries. "Any security given or *delivered with* ... a purchase of ... any other thing shall constitute a part of the subject of such purchase and shall have been offered and *sold for a consideration.*" Or.Rev.Stat. § 59.015(11)(a) (1975) (emphasis added). Each purchase of property by the Butterfield Defendants for a partial consideration of BEC stock thus falls within the statutory definition of a sale of a security. We therefore hold that the district court erred by concluding that BEC was the sole seller of the stock and by granting Appellees' motion for summary judgment on that basis.

## B. Stock Registration

■ Our conclusion that the Butterfield Defendants as well as BEC were "sellers" under the Oregon statute is not dispositive of Appellants' claim that the Butterfield Defendants violated Oregon Blue Sky Law by sell-

---

such an obfuscatory fashion. It may be, as Appellants suggest, that the transactions were part of a scheme fraudulently to enhance Old BSL's balance sheet and that an explicit sale of the stock by BEC for a promise would have exposed the transactions to scrutiny. Or there may have been a more benign explanation. As described in text, however, we need not speculate about the parties' motivation in order to analyze the stock-for-property transactions.

4. The two cases that instead have concluded that a "seller" must actually pass title to the stock both involved conduct that occurred after section 59.015 had been amended to delete the "regardless of ... power to pass title" language. *See Newman v. Comprehensive Care Corp.*, 794 F.Supp. 1513, 1526 (D.Or.1992) (addressing "seller" under Or.Rev.Stat. § 59.115); *Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 1991 Fed.Sec.L.Rep. (CCH) ¶ 96,053, 1991 WL 45714 (D.Or.1991) (same). Our interpretation therefore is not in conflict with these two district court cases.

ing "unregistered securities." There is no violation if the Butterfield Defendants are entitled to the protection of BEC's registration.

Appellants give two reasons why the Butterfield Defendants cannot claim the protection of BEC's registration. First, they argue, BEC registered its preferred stock pursuant to federal Regulation D and Oregon Division 36, which necessarily renders the stock unregistered for purposes of the Butterfield Defendants' "resale" of the stock. *See* 17 C.F.R. § 230.501 preliminary note 4 (Regulation D is "available only to the issuer of the securities and not to any affiliate of that issuer or to any other person for resales of the issuer's securities"); Or.Admin.R. 815–36–035(1) (limiting eligibility for Oregon Division 36 registration to those issuers eligible for Regulation D). Second, Appellants argue that even if the Butterfield Defendants are entitled to the protection of BEC's registration, that registration was faulty (because BEC allegedly violated the terms of its registration) and so provides the Butterfield Defendants no protection.

The district court did not address either question. Accordingly, we remand to the district court for a determination of the relevance and validity of BEC's registration.

## III. CONTROLLING PERSON

■ Magistrate Judge Dale concluded that summary judgment should be granted for defendant Schwabe. The magistrate judge found that Terry Hauck, a Schwabe attorney, was not a "controlling person" under Or.Rev. Stat. § 59.115(3). He therefore concluded that the firm could not be liable for sales that violate Oregon Blue Sky Law. Findings & Recommendation at 29–31 (Sept. 17, 1992). Judge Frye apparently did not rule on this recommendation because she granted summary judgment on Appellants' entire complaint on the previously discussed basis that the sales were solely by BEC. We have no authority to reverse Magistrate Judge Dale's finding, as Appellants request. Instead, we

leave the question of Schwabe's liability under Or.Rev.Stat. § 59.115(3) for the district court's consideration on remand.

## IV. STATUTE OF LIMITATIONS

The district court granted Appellees' motion to dismiss the second claim for relief with respect to the ten Washington Plaintiffs. Op. & Order at 1–2 (Sept. 3, 1991). Judge Frye subsequently granted summary judgment to Appellees on this claim as to *all* plaintiffs. *See supra* Section II. As explained above, we reverse the grant of summary judgment. We also reverse the dismissal of the Washington Plaintiffs' claims on count two (sale of unregistered securities), and we remand to the district court for consideration of Appellants' "relation back" argument.

■ The second claim for relief in the fourth amended complaint was for sales of unregistered securities in violation of Oregon law. That claim, in paragraph 15, listed specific plaintiffs but did not identify the ten Washington Plaintiffs.[5] The sixth amended complaint made out a similar claim by all plaintiffs. The district court concluded that the ten plaintiffs had not asserted a claim for sale of unregistered securities until the sixth amended complaint, and thereby had exceeded the three-year limitations period. We agree.

By identifying specific plaintiffs in the second cause of action, Appellants by implication excluded the other plaintiffs from that claim. We therefore hold that the excluded plaintiffs did not state a claim against Appellees until the sixth amended complaint, by which time the statute of limitations had run. Appellants argue that even if otherwise untimely, the claim in the sixth amended complaint "relates back" to the date of the original pleadings, pursuant to Fed.R.Civ.P. 15(c). Judge Frye apparently did not rule on Appellants' relation back argument. We thus remand the relation back issue for the district court's consideration.

**5.** We find unpersuasive Appellants' argument that the third claim in the fourth amended complaint, which identified all plaintiffs, provides the basis for the present sale-of-*unregistered* securi-

ties claim. The third claim was based on violations of restrictions on sales of *registered* securities, while the second claim alleged the improper sale of *unregistered* securities.

## V. POTENTIALLY LIABLE PARTIES

The district court granted Appellees' motion for summary judgment as to Appellants' claims against New BSL and the Butterfield Subsidiaries. The lower court held that pursuant to the Acquisition Agreement (between New BSL and FDIC–Receiver) and the Receiver Agreement (between FDIC–Receiver and FDIC–Corporate), the only defendant potentially liable on Appellants' claims was the FDIC in its capacity as receiver for Old BSL. Op. at 7 (Nov. 26, 1991).

Appellants' arguments treat New BSL and the Butterfield Subsidiaries separately. Appellants do not seriously contest the FDIC's authority to apportion Old BSL's assets and liabilities and to limit the liabilities assumed by New BSL. They argue, however, that their claims may be asserted against New BSL because the P & A Agreement did in fact transfer to New BSL liability for those claims. On the other hand, Appellants do challenge the FDIC's authority to wipe out claims against the Butterfield Subsidiaries by means of a P & A Agreement between the FDIC and New BSL. Appellants thus argue that the P & A Agreement does not preclude them from bringing their claims against the Butterfield Subsidiaries.

### A. New BSL

■ Immediately after Old BSL was declared insolvent, FDIC–Receiver and New BSL entered into an Acquisition Agreement, which states, in part:

The ACQUIRING ASSOCIATION [New BSL] hereby expressly assumes and agrees to pay, perform, and discharge all of the CLOSED ASSOCIATION's [Old BSL's] liabilities.... The term "liability" as used in this section does not refer to any obligation of [Old BSL] to its stockholders for or in connection with their stock holdings ... and [New BSL] specifically does not assume by virtue of this Agreement any such obligations to the stockholders of [Old BSL].

Simultaneously, FDIC–Receiver and FDIC–Corporate entered into a Receiver Agreement whereby FDIC–Corporate acquired the remaining assets and most of the remaining liabilities of Old BSL. The Receiver Agreement provides, in part:

The CORPORATION [FDIC–Corporate] hereby assumes and undertakes to pay and discharge those liabilities of the RECEIVER [FDIC–Receiver] not assumed by [New BSL], except that [FDIC–Corporate] specifically does not assume or agree to discharge ... (2) any obligation of [Old BSL] to its stockholders in connection with their stock holdings.

By their terms, the agreements only apply to stockholders of "Old BSL." Pursuant to the agreements' literal language, then, Appellants, as stockholders in BEC rather than Old BSL, are among those whose claims were assumed by New BSL. Despite the literal language, the district court interpreted the agreements as requiring BEC stockholders such as Appellants to bring their claims against FDIC–Receiver rather than against New BSL. The lower court reasoned: "The shareholders of the BEC who bring this action 'in connection with' their ownership of stock ... are the only shareholders who could bring an action 'in connection with' the stock of Old BSL." Op. at 7 (Nov. 26, 1991).

We agree that the Acquisition and Receiver Agreements should be interpreted in this manner, notwithstanding their literal language, because this construction "seems to us to be the only agreement into which New [BSL] would have entered." *See Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1109 (11th Cir.1990). The purpose of the agreements must have been to limit New BSL's liability for "the latent claims of unknown magnitude of shareholders." *See id.* Because BEC is BSL's sole shareholder, the agreements do not accomplish this purpose unless they are construed to apply to claims by BEC's shareholders.

Any claims by Appellants that are "in connection with" their ownership of stock in BEC must be brought against FDIC–Receiver and not against New BSL. Therefore, as to New BSL, the motion for summary judgment was properly granted.

### B. Butterfield Subsidiaries

■ Although we affirm the grant of summary judgment in favor of New BSL, we

reverse as to the Butterfield Subsidiaries. Even acknowledging the FDIC's broad powers to effect a reorganization of a failed institution, we agree with Appellants that the FDIC cannot use a P & A Agreement with New BSL to strip away claims against the Butterfield Subsidiaries, which are corporate entities distinct from BSL.[6]

The FDIC (formerly the FSLIC) was broadly authorized to take appropriate steps in dealing with a distressed institution:

> In the event that a Federal association is in default, the Corporation shall be appointed as conservator or receiver and as such—
>
> > (A) is authorized—
> >
> > (i) to take over the assets of and operate such association;
> >
> > (ii) to take such action as may be necessary to put it in a sound solvent condition;
> >
> > (iii) to merge it with another insured institution;
> >
> > (iv) to organize a new Federal association to take over its assets;
> >
> > (v) to proceed to liquidate its assets in an orderly manner; or
> >
> > (vi) to make such other disposition of the matter as it deems appropriate;
> >
> > whichever it deems to be in the best interest of the association, its savers, and the Corporation; and
> >
> > (B) shall pay all valid credit obligations of the association.

12 U.S.C. § 1729(b)(1) (1982) (repealed by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, P.L. No. 101–73, 103 Stat. 183 ("FIRREA")). The FDIC also had broad powers to allocate assets and liabilities in order to effect a P & A Agreement:

> In order to facilitate ... the sale of assets of [an] insured institution and the assumption of such insured institution's liabilities by another insured institution, the Corporation is authorized, in its sole discretion and upon such terms and conditions as the Corporation may prescribe—
>
> > (i) to purchase any such assets or assume any such liabilities; [or]
> >
> > . . . .
> >
> > (iii) to guarantee such other insured institution ... against loss by reason of such other insured institution's ... assuming the liabilities and purchasing the assets of such insured institution[.]

12 U.S.C. § 1729(f)(2)(A) (1982) (repealed by FIRREA).

This grant of statutory authority expressly allowed the FDIC to apportion the assets and liabilities "of the insured institution," *i.e.*, Old BSL. We cannot conclude, however, as the district court apparently did, that the statute further allowed the FDIC, by means of a P & A Agreement between itself and the successor institution, to apportion the assets and liabilities of independent corporate entities, just because those entities are also assets of the failed institution. We have found no cases that endorse such a broad reading of the statutory language,[7] and we decline to stretch the language that far. We hold that the P & A Agreement does not bar Appellants from asserting claims "for or in connection with their stock holdings" against the Butterfield Subsidiaries.

---

**6.** Appellants alternatively argue that the Acquisition and Receiver Agreements arbitrarily allocate their claims, and not others' claims, to an entity with no ability to pay. This allocation, they argue, improperly discriminates against their claims. *See First Empire Bank v. FDIC*, 572 F.2d 1361 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). A discrimination claim is properly brought against FDIC–Corporate, and not against the successor institution or its subsidiaries. *See id.* at 1364, 1371. FDIC–Corporate is not a party in this case. We accordingly do not reach the merits of Appellants' discrimination argument.

**7.** The case cited by Appellees' for this proposition, *Lawson v. Fleet Bank*, only involves apportionment of the failed institution's liabilities, not the liabilities of the failed institution's independent corporate subsidiaries. 807 F.Supp. 136, 140–41 (D.Me.1992) (approving P & A Agreement that transferred insolvent institution's CD deposits to acquiring institution but did not transfer insolvent institution's corresponding contractual obligation to pay a particular rate of interest), *aff'd*, 3 F.3d 11 (1st Cir.1993); *see also Lawson v. Household Bank*, 20 F.3d 786, 788 (7th Cir.1994) (same).

## CONCLUSION

In sum, we affirm the district court's grant of summary judgment in favor of New BSL. The lower court erroneously concluded that BEC was the sole "seller" of the preferred stock, however, and we therefore reverse the district court's grant of summary judgment in favor of the remaining defendants and remand the case for a determination of the relevance and validity of BEC's stock registration. On remand, the district court may consider the issue of Schwabe's "control person" liability. We reverse the district court's dismissal of Appellants' second cause of action as to the Washington Plaintiffs and remand for consideration of Appellants' relation back argument. We also reverse the district court's grant of summary judgment in favor of the Butterfield Subsidiaries.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.