van Gestel, Allan, J.
This matter is before the Court on the Defendant’s Motion for Summary Judgment, Paper #75.

BACKGROUND

The facts that follow are undisputed.
iBasis, Inc. (“iBasis”), is a company in the business of providing voice-over IP services, which involves the use of the Internet to transmit telephone communications. The name of the company was changed from VIP Calling to iBasis on August 4, 1999.[2]
In 1996 or 1997, the defendant, Robert A. Maginn, Jr. (“Maginn”), then a partner at Bain & Company (“Bain”), approached the CEO of iBasis looking for consulting business. Thereafter, Bain accepted an engagement to perform consulting work for iBasis. After performing these services, Maginn and other partners at Bain became interested in iBasis as an investment opportunity. Maginn was appointed to the iBasis Board of Directors on November 11, 1997. He continued in that position until the end of May 2000.
In 1997, certain Bain partners, including Maginn, invested in iBasis through an entity known as Sunapee Securities, Inc. (“Sunapee”). Sunapee was an employee security company formed by Bain that allowed Bain employees to make investments using pre-tax dollars. Participation in Sunapee was limited to Bain partners who were “accredited investors” as defined in Rule 501 of the Securities Act of 1933.
In December 1997, and June 1998, Sunapee purchased unregistered shares of Series A Convertible Preferred iBasis stock for $1 per share. This stock would automatically convert into iBasis common stock upon the closing of an iBasis public offering.
Seventy-five thousand dollars was withheld from Maginn’s compensation at Bain for purposes of his investment in iBasis through Sunapee. Maginn, thereby, owned an interest in 75,000 of the Series A iBasis shares purchased by Sunapee.
In the first or second quarter of 1999, iBasis decided to offer unregistered Series C Convertible Preferred shares. Only existing holders of iBasis securities who had preemptive rights were permitted to acquire iBasis Series C shares. Again, like Series A, iBasis Series C Convertible Preferred stock automatically converted into iBasis common stock upon the closing of an iBasis public offering.
iBasis raised $25.1 million through the sale of the Series C shares.
In issuing the Series C shares, iBasis relied upon the exemption from the registration requirements of the Securities Act of 1933 set forth in Regulation D (17 C.F.R. secs. 501-06). As part of their purchase of Series C shares, all purchasers were required to represent and warrant that they were “accredited investors,” and acknowledge that iBasis was relying upon such representation and warranty to establish that an exception from registration of the shares was available.
As a result of the earlier purchase of Series A shares, the Bain partners, including Maginn, who participated in that investment obtained preemptive rights to invest in the Series C shares.
Maginn and the plaintiff Alan Frishman (“Frishman”) first came into contact in May or June of 1999. At that time, Maginn was raising capital for a privately held company now known as Jenzabar, Inc. (“Jenzabar”). A common acquaintance of Maginn and *42 Frishman, Charles Farkas (“Farkas”), inquired of Frishman about his interest in the Jenzabar investment. Farkas had been an early investor in Jenzabar.
Jenzabar was then a leading provider of enterprise software to colleges and universities. The company was formed in 1998 by Maginn’s then fiancee (now wife), Ling Chai (“Chai”). Jenzabar was originally known as CollegeNet, Inc. As of the summer of 1999, Chai was the CEO of Jenzabar and Maginn was Chairman of its Board of Directors. In March of 2001, Maginn became CEO of Jenzabar.
On May 27, 1999, a limited liability company known as New Media Investors II, L.L.C. (“NM II”), was formed as a vehicle for investing in unregistered securities of Jenzabar.
Participation in NM II was limited to “accredited investors.” Maginn was named the Managing Member of NM II.
NM II’s Limited Liability Company Agreement grants to its Managing Member “the right, power and authority, in the management of the business and affairs of the Company, to do or cause to be done, any and all acts deemed by the Managing Member to be necessaiy or appropriate to effectuate the business, purpose, and objectives of the Company . . .” In addition, the Managing Member has “the power to appoint agents ... to act for the Company . . . and to delegate to such agents the powers as are held by the Managing Member.”
In May and June 1999, Frishman informed a number of his friends and family members about the opportunity to invest in Jenzabar. Thereafter, Frishman assembled a group of investors that invested a total of $200,000 in Jenzabar through NM II. Frishman’s group included himself, the plaintiff Richard Simon (“Simon”), Jack Frishman, Edward Nassberg, Kenneth Gross, Yun Peng Wei (“Johnny Wei”), Gang Xiao (“Kevin Xiao”), and Lily E. Deng (“Lily E.”).
By checks dated June 2, 1999, Frishman, in his own name, invested $50,000 in Jenzabar through NM II, and $12,000 for his daughter Dana. He wrote checks in these amounts to CollegeNet, Inc. In connection with his investment, Frishman executed a NM II Subscription and Adoption Agreement in his name, and another on behalf of his daughter Dana. Frishman also executed a NM II Limited Liabiliiy Company Agreement and submitted a Jenzabar Investor Suitabiliiy Questionnaire.
By check dated June 8, 1999, Jack Frishman, in his wife Joan Frishman’s name, invested $25,000. By check dated June 9, 1999, Edward Nassberg, in his wife Sheila Nassberg’s name, invested $25,000. Also, at about the same time, Kenneth Gross, in his wife Felicia Gross’s name, invested $25,000. By check dated June 21, 1999, Simon invested $50,000 in Jenzabar through NM II. These various checks, like Frishman’s, were each made out to CollegeNet, Inc.
In connection with their investments, in June 1999, Simon, Joan Frishman, Sheila Nassberg and Felicia Gross each also executed a NM II Subscription and Adoption Agreement and filled out and submitted a Jenzabar Investor Suitability Questionnaire. By executing the NM II Subscription and Adoption Agreement, Frishman, Simon, Joan Frishman, Sheila Nassberg and Felicia Gross became members of NM II.
Still further, by another check dated June 9, 1999, Lily E. attempted to invest $5,000 in Jenzabar through NM II. However, because Lily E. was not an accredited investor, Maginn returned to her $5,100, being her attempted investment, plus agreed-upon interest of $100.
Maginn advised Frishman that neither Lily E., nor Johnny Wei or Kevin Xiao, because none of them were accredited investors, could invest directly in Jenzabar. Instead, Maginn told Frishman that if they wanted to invest in Jenzabar through NM II they would have to do so through Frishman. Thereafter, on June 14, 1999, Frishman sent one of his own checks in the amount of $13,000 to CollegeNet, Inc. as an investment through NM II. Later in June 1999, Frishman accepted $5,000 each from Lily E. and Johnny Wei, and $3,000 from Kevin Xiao.
On June 29, 1999, another limited liability company known as New Media Investors III, L.L.C. (“NM III”) was formed to allow Bain partners with preemptive rights to acquire an interest in the unregistered Series C shares of iBasis mentioned above. Participation in NM III was limited to Bain partners who were “accredited investors.” Maginn and Gary Wilkinson (“Wilkinson”), Bain’s corporate treasurer at the time, were named co-Managing Members of NM III.
Some Bain partners who had preemptive rights to purchase iBasis Series C shares chose not to do so. Maginn then acquired the interest of the iBasis Series C shares of all Bain partners who decided not to exercise their preemptive rights though NM III.
iBasis issued the Series C shares to NM III on July 12, 1999. NM III purchased the shares at a price of $4.37 per share. Maginn contributed $340,062 to the capital of NM III for the purchase of Series C shares. He paid for his interest with a check dated August 16, 1999. Maginn, thereby, acquired an interest in 77,817 Series C shares of iBasis through NM III. This purchase of $340,062 covered both Maginn’s initial allotment and the “extra” shares he had picked up from those Bain partners who decided not to exercise their preemptive rights.
In July or August of 1999, Frishman sent an e-mail to Maginn setting forth several ideas for services that Jenzabar could provide to its customers. Also, on August 10, 1999, Maginn sent an e-mail to Frishman indicating that he wanted to talk with Frishman about *43 “what might be possible on [iBasis].” Maginn further stated, “I will not be able to offer shares of [iBasis] broadly but in a few selective cases I may be able to offer $25-34k . . .”
Later in the day on August 10, 1999, Frishman replied to Maginn. In his response, Frishman stated in part, “Thanks for your email earlier today. The Frishman’s [sic] are taken aback by your generosity . . . You can also count us in for VIP and I’ll send you a check tomorrow after we go over all the details.”
On August 11, 1999, Frishman spoke to Maginn by telephone about the proposed assignment from Maginn’s NM III position. During the conversation, Maginn indicated that the proposed assignment “wasn’t a done deal and that he would toy to make it work.” Further, Maginn told Frishman that he hoped to provide him with $40,000 worth of pre-IPO shares in iBasis. iBasis was planning an initial public offering in late 1999. He further advised Frishman that the iBasis shares which he would be assigning to Frishman would of necessity be “locked up” for a period of six months following the IPO.
Later on August 11, 1999, Frishman sent another e-mail to Maginn. This e-mail read, in part:
I am posting to you a check for $40,000 to cover the 20% “linkage” in [iBasis] through New Media III based on our group’s $200,000 investment in Jenzabar. The group consists of the following accredited investors (Jenzabar investment):
Dick Simon ($50,000)
Alan Frishman ($50,000)
Jack Frishman ($25,000)
Ed Nassberg ($25,000)
Ken Gross ($25,000)
The remaining $25,000 is a consortium (boy, is that an overstatement or what?) headed by Dana’s trust and including 3 other friends of Lily. This stock is held in my name given the eventual investment accredation [sic] requirement in Jenzabar.
On August 12, 1999, Frishman sent an e-mail to Simon, Edward Nassberg, Kenneth Gross, Kevin Xiao and Lily E informing them of the proposed assignment from Maginn’s NM III position. Frishman indicated in the e-mail that the proposed assignment was not certain yet. He also advised that, “As an insider, however, we will have to hold the stock before we can sell it for 6 months from the IPO date.”
Maginn responded to Frishman’s August 11, 1999, e-mail on August 12, 1999. In his reply, Maginn stated, in part:
thank you for your email. I will have the lawyer draft an assignment from my new media III position to you and your group. Your share will be 75k over 200k and the rest as indicated in your email. As you know only accredited investors can invested [sic] in New Media II or III. Have a great trip. I believe the lawyers should have the assignment drafted by next week so I would go ahead and ask for the others to reimburse you next week and I will deposit your check then too.
On August 12, 1999, Frishman mailed a check to Maginn for $40,000. On the “Memo” line of the check, Frishman wrote “assignment of New Media III.” When Frishman wrote these words, it was his understanding that he was to be given some type of document by which Maginn would assign his rights in NM III to Frishman. Maginn deposited Frishman’s check on August 31, 1999.
In October 1999, Frishman received from the following persons, the amounts after their names: Simon, $10,000; Sheila Nassberg, $5,000; Jack Frishman, $5,000; Kevin Xiao, $600; Johnny Wei, $1,000; and Lily E., $1000. Frishman considered these people to be his co-investors in the proposed assignment from Maginris NM III position.
Kevin Xiao, Johnny Wei and Lily E. remained unaccredited investors.
Kenneth Gross never sent Frishman any money for the purpose of the proposed assignment from Maginn’s NM III position. His share was picked up by Frishman.
As of October 7, 1999, Frishman advised Edward Nassberg that the iBasis opportunity “is not yet fully resolved.” This was in a letter asking Nassberg for his reimbursement. What Frishman meant was that he “had no paperwork from [Maginn] at that point.” Frishman was concerned about this. “If it turned out to be a huge successful deal and [Maginn] decided it’s too good a deal and changed his mind, [Frishman] could have a problem.”
iBasis had its initial IPO on November 10, 1999.
On November 13, 1999, Maginn sent an e-mail to Frishman. It said, in part:
Thanks for your email . . . lets [sic] keep thinking what we can each do to help IBAS make its numbers. New Media III will be locked up for at least 6 months and IBAS may well be a stock for the ages like ATT.
Thanks for the attached email since I was confused about which one you referred too [sic] on the phone. As indicated in my old email, I have only deposited your 40K and will leave you to deal with the others. They are only in new media because of you and I dont [sic] have time as this 430am email attests to deal with these small amounts (eg $2k for gaiy and key should have been sent to you not me).
In November 1999, Frishman had a series of meetings with Maginn and Ling Chai which resulted in their offering him a position at Jenzabar as its Senior Vice President for Operations. Frishman accepted their offer and on December 1, 1999, went to work at Jenzabar in that capacity.
*44 On January 31, 2000, Frishman was fired under bad terms by Jenzabar. During the brief time that Frishman was employed by Jenzabar, he saw Maginn “when he would come over to the Jenzabar office, frequently, on a daily basis.” Frishman and Maginn never discussed the $40,000 Frishman had given Maginn for the proposed assignment of Maginn’s NM III position during the time Frishman was at Jenzabar.
On May 15, 2000, Frishman filed a civil action in Middlesex Superior Court against Jenzabar, Chai, Maginn and NM II asserting claims arising out of his employment (the “Jenzabar litigation”).
About two months after attempted mediation of the Jenzabar litigation, Maginn’s counsel in that suit, on April 11, 2002, enclosed a check for $40,000 from Maginn representing a return of the money given by Frishman to Maginn for the proposed assignment of Maginris NM III position. By letter dated May 3, 2002, Frishman advised Maginn’s attorney that he would credit the $40,000 check against the damages owed to him by reason of Maginris breach of his contract to sell the iBasis shares, but not in full satisfaction of the amount owed.
On June 25, 2002, Frishman filed a motion in the Jenzabar litigation seeking to enforce a settlement agreement that was negotiated by the parties but was not approved by the Jenzabar Board of Directors. On July 12, 2002, Judge Gants denied Frishman’s motion, but granted Frishman leave to amend his complaint to include a claim or claims seeking reliance damages stemming from the failure of Jenzabar’s Board of Directors to approve the settlement agreement which excepted from the general release Frishman’s claims against Maginn relating to iBasis.
On July 31, 2002, Frishman filed a motion in the Jenzabar litigation seeking leave to file late his Second Amended Complaint. This motion was allowed on August 6, 2002. The Second Amended Complaint contained a count in which Frishman sought damages stemming from alleged representations by Maginn during a mediation and the subsequent failure of the Jenzabar Board to approve the settlement agreement which excepted from the general release Frishman’s claim against Maginn relating to iBasis.
The Jenzabar litigation was ultimately resolved by a Release and Settlement Agreement dated October 31, 2002. The Release and Settlement Agreement was between and among “Alan Frishman . . . and Jenzabar, Inc.....Robert A. Maginn, Jr., Ling Chai and New Media II, LLC.” In the release portion of the Release and Settlement Agreement, the following language is included:
(P)rovided, however, that: (1) Frishman does not release, waive or discharge, in whole or in part, any demands, claims, actions, causes of action, suits, liens, or controversies, proceedings, debts and liabilities, of every name and description (including without limitation those in law, equity, negligence, tort, breach of contract, fraud, misrepresentation, or violation of G.L.c. 93A or other statute) against Maginn arising from or relating to the investment, or alleged, promised, or intended investment, by Frishman in the stock of [iBasis] and/or New Media III, LLC and/or Maginris interest in [iBasis] and New Media III, LLC . . .
A stipulation of dismissal, with prejudice, executed by counsel for both sides of the case, thereafter was filed in the Jenzabar litigation.
On November 12, 2002, then counsel to Frishman sent a G.L.c. 93A claim letter to then counsel for Maginn concerning the matters in issue in this case. Then counsel for Maginn duly responded to the November 12, 2002 letter by a letter dated December 13, 2002. Thereafter, a year later, present counsel to Frishman, on November 11, 2003, sent a supplemental c. 93A claim letter directly to Maginn.
This case was filed on February 13, 2004.
In early 2004, Jenzabar was involved in a recapitalization and refinancing. As part of the recapitalization, Jenzabar and NM II entered into certain agreements. One of those agreements related to certain Jenzabar Series A shares. Maginn, as Managing Member of NM II appointed Dennis Yannatos (“Yannatos”) as NM II’s authorized agent to solicit the vote of each of the members of NM II relating to the recapitalization of Jenzabar. Frishman, Simon, Joan Frishman and Sheila Nassberg were among the members solicited by Yannatos.
In the recapitalization, NM II agreed to exchange its Jenzabar stock for shares of a Series A Junior Preferred Stock and warrants. Section 6.1 of the exchange agreements provided general releases of all claims against Jenzabar “and its respective predecessors, successors, affiliates, subsidiaries, parents or controlling entities and each of their respective affiliates and subsidiaries, and all of their respective past, present and future shareholders, directors, officers, partners, members, employees, investors, representatives, attorneys, agents and assigns.” Maginn was named as a releasee in the Jenzabar Series A agreement. A majority of NM II’s membership voted in favor of the Jenzabar capitalization.

DISCUSSION

“Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving parly is entitled to judgment as a matter of law.” M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 89 (2004); Kesler v. Pritchard, 362 Mass. 132, 134 (1972). Mass.R.Civ.P. Rule 56(c). Here, the moving party is Maginn and the nonmoving parties are Frishman and the other plaintiffs. “The inferences which may be drawn from the facts alleged are to be viewed ‘in the light most favorable to the parties opposing summary judgment.’ ” Davidson Pipe Supply Co, Inc., *45 v. Johnson, 14 Mass.App.Ct. 518, 522 (1982). “[T]he judge’s function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). “[T]he judge must ask himself not whether he thinks the evidence un-mistakenly favors one side or the other but whether a fair-minded jury could return a verdict for [the nonmoving party] on the evidence presented." Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
At trial Maginn does not have the burden of proof. There the burden is on Frishman and the other plaintiffs. Where the party who does not have the burden of proof at trial establishes that the other parties cannot prove an essential element of their case, summary judgment is appropriate. Manning v. Nobile, 411 Mass. 382, 388 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991).
The complaint here is in two counts. Count I charges a breach of contract by Maginn with regard to the conveyance to the plaintiffs of the iBasis shares. Count II claims violations of G.L.c. 93A, secs. 2, 9 and/or 11.
In the introduction to Maginn’s memorandum in support of his motion he sets out his grounds therefor.
Both of plaintiffs’ claims fail because they have been released under agreements entered into by a limited liability corporation authorized to act on plaintiffs’ behalf.
The breach of contract claim also fails because: (1) Frishman and Maginn never reduced the alleged contract to writing, as both had contemplated, nor agreed on all material terms; and (2) as a result of Frishman’s inclusion of unaccredited investors in his group, enforcement of the alleged contract would violate the public policy underlying applicable federal securities laws and regulations . . .
The c. 93A claim also fails because; (1) Frishman released it under a release and settlement agreement executed in connection with his employment litigation against Maginn and others; (2) the allegedly unfair conduct at issue did not take place in trade or commerce; (3) plaintiffs have not suffered any loss of money or property, as required under section 11; and (4) to the extent Richard Simon, Joan Frishman and Sheila Nassberg allege a claim under section 9, it is barred for failure to submit a pre-suit demand letter to Maginn.
The Court will address first Count I that asserts that Maginn breached an agreement to convey iBasis shares, then will take up Count II which charges him with violation of G.L.c. 93A and conclude, if necessary, with the release arguments.

The Contract Claims

The Court begins with the basic issue of whether there ever was a contract between Maginn and the plaintiffs regarding the sale or transfer from him to them of any iBasis shares or at least an agreement to assign to the plaintiffs a portion of Maginn’s interest in the iBasis shares.
Here, both Frishman and Maginn contemplated that Maginn’s lawyer would “draft an assignment from [Maginn’s] [N]ew [MJedia III position to [Frishman] and [his] group.” Maginn’s August 12, 1999 e-mail so stated; and Frishman understood that to be the case. However, no draft of an assignment or any other document of agreement ever came into being.
[W]here the facts show that the parties intended to be bound at some point in their negotiations before execution of a formal contract, they will not be bound unless there is agreement as to the basic terms of the undertaking. See Geo. W. Wilcox, Inc. v. Shell E. Petroleum Prod., Inc., 283 Mass. 383, 387, 390 (1933). There must be agreement on the essential terms of the transaction in order that the nature and extent of the parties’ obligations can be determined and, hence, enforced. See Simons v. American Dry Ginger Ale Co., 335 Mass. 521, 525-26 (1957).
Novel Iron Works, Inc. v. Wexler Construction Co., 26 Mass.App.Ct. 401, 408 (1988).
An agreement may be enforceable that anticipates a more formal writing, but in such case, the parties must have agreed upon either the material terms, or upon the “formulae and procedures” that will provide the material terms at some future date. See Lafeyette Place Assocs. v. Boston Redev. Authy, 427 Mass. 509, 521 (1998). See also Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000); Goren v. Royal Invs., Inc., 25 Mass.App.Ct. 137, 140 (1987).
For Maginn to be bound to Frishman and his group regarding the iBasis shares, at a minimum there must be agreement as to the amount or quantity of shares involved, the amount to be paid for the shares and the time at which the shares are to be delivered or any interest therein to be assigned. See, e.g., McCarthy v. Tobin, 429 Mass. 84, 86 (1999). The controlling fact of course, is the intention of the parties. Id. at 87.
Here, the e-mail and telephone exchanges between Maginn and Frishman in August and November 1999, provide the grist. The amount to be paid was $40,000, and by the end of August 1999, Frishman’s check for that amount was in Maginn’s hands and deposited by Maginn into his account. That amount, together with the amount Maginn paid for his shares, provides a ready and simple formula or procedure for determining with precision the quantity of shares involved.
NM III purchased the iBasis shares for $4.37 per share. Maginn contributed $340,062 to the capital of NM III for the shares he purchased. This results in Maginn acquiring 77,817.39 shares. Frishman’s $40,000, at $4.37 per share would result in 9,153.32 shares.
*46 Thus, two of the key elements for an agreement are known.
The element of “when,” that is the time when the shares, or the interest therein, were to be conveyed to Frishman is less clear. Both Maginn and Frishman, however, were aware that the New Media III shares would be “locked-up" for six months from the iBasis IPO, which occurred on November 10, 1999. The lock-up time would, therefore, expire in mid-May of 2000.[3]
This Court, in assessing the summary judgment record must view any inferences from the facts alleged “in the light most favorable to [the Frishman group] the parties opposing summary judgment.” Davidson Pipe Supply Co, Inc., supra, 14 Mass.App.Ct. at 522. Consequently, for purposes of the present motion at least, the Court infers that on the date in May 2000 when the lock-up period expired or, at the latest, on the July 12, 2000 date referred to in the Wilkinson memorandum of June 6, 2000, Maginn was obligated to transfer 9,153.32 shares of iBasis shares, or assign the interest therein, to Frishman and his group.
Further, implicit in such a transfer of the shares or the interest therein, it is inferred that the Frishman parties then would be free to sell or hold those shares, as they chose, without limitation by NM III or Maginn.
If . . . the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract. Goren, supra. See Coan v. Holbrook, 327 Mass. 221, 224 (1951) (“Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof. . .”).
McCarthy, supra, 429 Mass. at 87.
Maginn’s first contention — -that the Frishman parties’ breach of contract claim fails because the parties did not reduce their agreement to writing and did not agree upon the material terms — cannot succeed on his motion at the summary judgment stage.
Maginn also argues that enforcement of the agreement alleged by the Frishman parties would violate public policy. He argues that because Frishman has admittedly included unaccredited investors in his group — Kevin Xiao, Johnny Wei and Lily E. — enforcement would violate the policy underlying the Securities Act of 1933 and SEC Regulation D. The argument is that both the Securities Act and Regulation D are designed to protect unsophisticated investors of limited means who are less capable of “fending for themselves.” Maginn cites to Beacon Hill Civic Ass’n v. Ristorante Toscano, Inc., 422 Mass. 318, 319 (1996), for the proposition that there should be no enforcement of a contract that would violate public policy.
Maginn points out that “Regulation D is a series of six rules, designated Rules 501-506, that establish three exemptions from the registration requirements of the Securities Act. . .” 1982 WL 35662 (SEC Release No. 33-6389 (March 8, 1982)). The phrase “accredited investor” in Rule 501 means any person who comes within, or whom an issuer of stock reasonably believes comes within, any of eight categories of investors at the time of sale. 17 C.F.R. sec. 230.501 (a)(1)-(8). These categories define “types of purchasers that, based upon objective criteria indicating financial sophistication and ability to fend for themselves, do not require the protections of registration under the federal securities laws.” 2001 WL 34681692 (SEC Release No. 33-8041 (December 19, 2001)). “Generally, these categories include wealthy and/or financially sophisticated investors such as banks, insurance companies, tax-exempt organizations, directors and executive officers of the issuer, and natural persons who have considerable net worth or large annual incomes.” Thomas Lee Hazen, LAW OF SECURITIES REGULATION, sec. 4.20[2][A] (5th ed. 2005).
Whether persons to whom unregistered securities — like those here — are offered under Regulation D qualify as “accredited investors” significantly affects the issuer’s disclosure obligations. If sales are made to unaccredited investors, the issuer must make an extensive disclosure of information to those unaccredited investors. See 17 C.F.R. sec. 501(b)(1)-(2).
In the case of the iBasis shares in issue here, there were specific requirements, including representations and warranties, that all investors were accredited.
“The design of the [Securities Act] is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions.” Sec. and Exch. Comm’n v. Ralston Purina Co., 346 U.S. 119, 124 (1953). The purpose of the requirements “is to facilitate and expedite specially designed offerings, while at the same time offsetting the danger posed by the lack of SEC scrutiny of the offer and sale by precluding those from participating in the offering who are inexperienced purchasers of securities and unable to afford professional advice regarding the merits and risks of purchasing the offered securities.” Integrated Res. Real Estate Ltd. P'ships Litig., 815 F.Sup. 620, 628 (S.D.N.Y. 1993).
An entity, such as Frishman’s group of investors, qualifies as an “accredited investor” only where all equity owners are accredited investors. 17 C.F.R. sec. 230.501(8).
Both Maginn and Frishman were fully aware of the unacceptability of unaccredited investors in the iBasis transactions in issue. Maginn reminded Frishman constantly about the issue. Indeed, in the Jenzabar transaction, Maginn returned to Lily E. the $5,000 she sent him because she was unaccredited.
Further, Frishman, in his August 11, 1999, e-mail to Maginn described his “group” to include $25,000 of *47 investment from a “consortium” which he described parenthetically as “(boy, is that an overstatement or what?).” Frishman was clearly referring to Kevin Xiao, Johnny Wei and Lily E.
Maginn argues, persuasively, that Frishman — and Maginn, as well — should not be able so facilely to avoid the protections of Regulation D by the simple artifice of having iBasis issue the shares to NM III, in which Maginn had an interest, and then permit Maginn to transfer or assign his interest in those very same shares to Frishman, who was known to be acting on behalf of some unaccredited investors.
Frishman responds with an argument that “Regulation D is inapplicable to this case, and after the expiration of the lock-up period, [Maginn] was free to sell his iBasis stock to accredited and unaccredited investors under SEC Rule 144.” He contends that the Rule 506 exemption on which iBasis relied in issuing the Series C shares is promulgated for the purpose of providing a safe harbor to an issuer which is engaging in a nonpublic offering. See Hazen, supra, at secs. 4.19 and 4.20. The essence of Frishman’s argument is that Regulation D only applies “to the issuer of the securities and not to any affiliate of that issuer or to any other person for resale of the issuer’s securities.” He cites to West Park Associates v. Butterfield Sav. & Loan Ass’n, 60 F.3d 1452, 1457 (9th Cir. 1995).
Further, Frishman points to the June 6, 2000 Wilkinson memorandum which makes reference to Rule 144. In material part that memorandum reads:
The iBasis shares are restricted and are not registered with the securities and exchange commission (“SEC”). Your ability to sell shares will be subject to the provisions of Rule 144 under the Securities Act of 1933. Rule 144 sets forth numerous conditions that must be met in order to sell restricted shares. For your general information, the following conditions apply to any sales: (i) the amount of securities which may be sold in any three-month period is limited; (ii) the securities must be sold in a broker’s transaction or directly to a dealer who is a market maker in the securities and (iii) a notice of the proposed sale on Form 144 must be sent to the SEC and to the principal exchange on which the shares are lists [sic]. ..
Frishman’s argument overlooks two significant concepts in applying the securities laws and regulations. First, the law must not be construed technically and restrictively, but flexibly to effectuate its remedial purpose. SEC v. Brigadoon Scotch Distributors, Ltd, 388 F.Sup. 1288, 1290 (S.D.N.Y. 1975). Second, “the registration provisions are designed not only to protect immediate recipients of distributed securities . . . but also subsequent purchasers from them.” SEC v. Harwyn Industries Corp., 326 F.Sup. 943, 953 (S.D.N.Y. 1971).
Here, Frishman claims a contractual right on behalf of his investing group — which includes three unaccredited investors — to 9,153.32 shares of unregistered iBasis shares, from Maginn, immediately upon the conclusion of the lock-up period. If Rule 144 can be read to permit this kind of a transaction then it appears to be “loophole” similar in kind to that not permitted in SEC v. Harwyn Industries Corp. It is not something that this Court believes correctly applies the relevant law. “It is well established that courts will not enforce contracts that violate public policy.” A.Z. v. B.Z., 431 Mass. 150, 160 (2000).
Frishman’s contention that the three unaccredited investors in his group relied upon Frishman’s knowledge in making the investment in iBasis is unconvincing. Frishman, in his deposition taken on July 13, 2005, testified as follows:
Q. When was the first time in your conversations, your oral conversations with Mr. Maginn, when was the first time VIP Calling or iBasis was mentioned?
A. The day of or after Mr. Maginn’s e-mail when he brought up the opportunity. I believe it was either August 10th or 11th.
Q. Had you not discussed VIP Calling or iBasis with Mr. Farkas before August 10, 1999?
A. I had never heard the name before August 10th, to the best of my recollection.
Q. So then is it your testimony, as soon as he mentioned the subject ofVIP Calling/iBasis, you were very interested in making an investment, is that right?
A. When he mentioned it?
Q. Yes.
A. No.
‡ ‡ * ‡ ♦
Q. And what did you do to check out. . . VIP Calling before you decided to send Mr. Maginn a check for $40,000?
A. I called Chuck Farkas.
Q. Did you do anything else?
A. Excuse me?
Q. Did you do anything else?
A. No.
Q. You didn’t check publicly available sources?
A. No.
Frishman did not possess any knowledge at all that would enable him to provide his unaccredited investors the “professional advice regarding the merits and risks of purchasing the offered securities” called for in Integrated Res. Real Estate Ltd. P’ships Litig., supra, 815 F.Sup. at 628.
Where there is no conflicting evidence as to the terms of an oral contract, the construction of those terms is a matter of law for the judge rather than the jury. .. Thus, where the terms of the contract are not disputed, whether a contract is void as in contravention of public policy or otherwise illegal or in violation of law is a question of law for determination *48 by the judge . . . Even if, at the time of contracting, the parties to the contract did not mean the services to be rendered to include illegal conduct, there can be no recovery if the performance was in fact illegal, and the illegality was serious and not merely an incidental part of the performance of the agreement . . . The question whether the illegality was serious or more than an incidental part of the performance has been held in some cases to be an issue of law which should not be left to the jury.
Green v. Richmond, 369 Mass. 47, 51 (1975).
Clearly, the Securities Act of 1933 and the regulations in aid of applying it coming, as they did, so soon after the stock market crash in 1929 and at the height of the Great Depression, must be seen and interpreted as setting strong public policy supporting the protection of innocent, naive and impecunious investors. Kevin Xiao, Johnny Wei and Lily E. were precisely the kinds of investors targeted for protection by the Securities Act of 1933 and Regulation D.
“Public policy” in this context refers to a court’s conviction, grounded in legislation and precedent, that denying enforcement of a contractual term is necessary to protect some aspect of the public welfare . . . (“The test is, whether the underlying tendency of the contract under the conditions described was manifestly injurious to the public interest and welfare.”) ... In determining the public interest and welfare in these circumstances, we look to the Legislature’s statutory enactment. Although the policy that induced the enactment may not be set out in terms, “(t]he Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed.”
Beacon Hill Civic Association, supra, 422 Mass. at 321. See also Eisenstein v. David G. Conlin, P.C.; Nixon Peabody, LLP, 444 Mass. 258, 259, 263-65 (2005).
Certainly, if the public policy surrounding the licensing of the sale of alcoholic beverages in a Beacon Hill restaurant warrants declaring illegal an agreement by that restaurant not to seek more than a beer and wine license, the public policy behind protecting unaccredited investors by forbidding the sale to them of unregistered securities deserves equal recognition by this Court.
The agreement here between Frishman and Maginn relating to the sale of iBasis shares to a group including Kevin Xiao, Johnny Wei and Lily E., each unaccredited investors, is void and unenforceable.

The G.L.c. 93A Claims

Count II repeats and re-alleges the paragraphs in the complaint upon which the contract claims are based and then says that the actions of Maginn “described in this complaint violated M.G.L.c. 93A, Sections 2, 9 and/or 11.”
Mere breach of a contract, without more, is insufficient to base a recoveiy under c. 93A. Credit Data of Central Massachusetts, Inc. v. TRW, Inc., 37 Mass.App.Ct. 442, 448 (1994). Even more so, is it insufficient when the contract has been determined unenforceable because of its clash with public policy.
Another hurdle to be overcome with the c. 93A claim is whether the “trade or commerce” requirement can be met. Although c. 93A, after the 1988 amendment, clearly applies to securities transactions, there still must be a commercial transaction, not a deal between private citizens. The breach of contract for sale of the iBasis stock was a private deal between Maginn and Frishman.
Further, a reading of paragraphs 18 and 19 of the complaint suggest that it was Maginn’s holding of the $40,000 as leverage in the Jenzabar settlement that was the real unfair act on which the c. 93A claim is grounded. If so, this clearly is not an act in trade or commerce.
Still further, the Supreme Judicial Court “has consistently recognized that, to warrant an award of damages under G.L.c. 93A, there must be a ‘causal connection between the seller’s deception and the buyer’s loss.’ ” Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 445 Mass. 790, 797 (2006). Here, Frishman sent Maginn $40,000 on August 12, 1999, which Maginn deposited in his account on August 31, 1999. This amount was made up of Frishman’s money and some additional portion from the others in his group. The $40,000 was returned by Maginn on April 11, 2002. The only “damages" thus suffered is interest on the $40,000 because of Maginn’s deprivation of the use of that money by Frishman and his group for a period of 31 plus months. At the statutory rate of 12% per annum, that amounts to something in the vicinity of $ 12,000. Thus, even if the other hurdles could be overcome, that is hardly worth the cost of this litigation.
Given the foregoing, this Court need not delve into the array of other issues put forward by Maginn in support of his motion.

ORDER

For the foregoing reasons, the Defendant’s Motion for Summary Judgment, Paper #75, is ALLOWED, and the complaint must be dismissed.
Pursuant to the provisions of Mass.R.Civ.P. Rule 56(d), this Court hereby specifies that the facts recited in the Background section hereof, pp. 1-11, appear without substantial controversy insofar as any further proceedings in this matter are concerned.

For simplicity, in this memorandum the Court will refer to the company as iBasis, unless the context otherwise requires, even though by way of timing it may have been in the VIP Calling years.

In Frishman’s opposition to the present motion he cites to a June 6, 2000 memorandum from Wilkinson, the managing partner at NM III, stating that there was a one-year lock-up on the iBasis shares that would expire on July 12, 2000.